**WHITE INDUSTRIES, INC., et al., Plaintiffs,**

v.

**The CESSNA AIRCRAFT COMPANY, et al., Defendants.**

No. 20245–B.

United States District Court,
W.D. Missouri, W.D.

March 20, 1985.

---

Edward McConwell, Overland Park, Kan., for plaintiffs.

Thomas Deacy, Dale Beckerman, Kansas City, Mo., for defendants.

## EVIDENTIARY RULINGS

ROSS T. ROBERTS, District Judge.

During the two and one-half month bench trial of the first phase of this case (liability proof by the individual plaintiffs, together with sufficient additional evidence to permit the court to address defendants' motion to decertify the class),[1] the court

---

1. Although other claims have been pleaded, plaintiffs' primary cause of action is asserted under the Robinson-Patman Act, 15 U.S.C. § 13(a). Essentially, plaintiffs (two Cessna "zone" dealers) claim that Cessna maintained a "dual" distribution system for its aircraft during the period in question; one side of the system being composed of independent, contracted distributors and their contracted dealers, and the other composed of Cessna-owned "zone" distrib-

utorships (not separately incorporated) and independent, contracted dealers operating thereunder ("zone dealers"). Aircraft sold by Cessna to independent distributors were generally sold at a lower price than aircraft sold to zone dealers. Plaintiffs assert that competition existed between *all* dealers and the independent distributors by reason of the latters' practice of selling to customers other than their contracted dealers, and that plaintiffs were disadvantaged in

reserved ruling upon a number of evidentiary questions. Following completion of a transcript, the court separated those questions into ten categories and requested the parties' thoughts regarding the basic rules to be applied to each. Having carefully considered the parties' suggestions in that connection, I now enter my rulings on those matters.

In making those rulings there will, in many instances, be no discussion of specific items other than as may be helpful for demonstrative purposes. For the benefit of the parties and any later appellate review, however, I will include a statement of my views regarding the general rules which would govern admissibility of items within each category.

## I.

### CATEGORY I.

Category I is concerned with a voluminous mass of documents found in defendants' files during discovery. In general, those documents may be separated into two broad subcategories: (a) documents, or parts of documents, authored by someone outside a defendant's employ, received by that defendant and retained in its files; and (b), documents authored by a defendant's employee which incorporate information emanating from someone outside the defendant's employ. Defendants object to each of the items as hearsay; plaintiffs counter with an assertion that they are admissible, variously, as business records under Fed.R.Evid. 803(6) ("records of regularly conducted activity"), or as adoptive, authorized or vicarious admissions of a party-opponent under Fed.R.Evid. 801(d)(2)(B), (C) or (D).

### A.

#### *Rule 803(6).*

■ I begin with the observation that the mere presence of a document—no mat-

ter what its authorship—in the retained files of a business entity does not by itself qualify that document as a record of "regularly conducted activity." *Standard Oil Co. of California v. Moore,* 251 F.2d 188, 215 n. 4 (9th Cir.1957). To the contrary, there must be proof (either direct or circumstantial) which satisfies each of the five foundational elements of Rule 803(6): (a) that the document have been made "at or near" the time of the matters recorded therein; (b) that the document have been prepared by, or from information transmitted by, a person "with knowledge" of the matters recorded; (c) that the person or persons who prepared the document have been engaged, in preparing it, in some undertaking, enterprise or business which can fairly be termed a "regularly conducted business activity;" (d) that it have been the "regular practice" of that business activity to make documents of that nature; and (e), that the document have been retained and kept "in the course of" that or some other "regularly conducted business activity." *See generally* 4 Weinstein and Berger, *Weinstein's Evidence* 803–174 to 803–212 (1984).

■ Turning to the parties' arguments here, two additional observations about Rule 803(6) are necessary. First, the "with knowledge" language of the Rule must be read as incorporating the "first-hand knowledge" requirement of Rule 602. *See* Advisory Committee Note to Rule 803; 4 *Weinstein's Evidence, supra* at 800–13, 803–187 to 803–192. That is, the information recorded must have originated with someone who had first-hand knowledge thereof. *Id.;* and *cf. McCormick on Evidence* 725–27 (2d ed. 1972). This does not mean, of course, that the proponent must produce the original informant as a witness; in fact the identity of the original

---

respect of that competition by virtue of the lower prices for which the distributors were able to purchase aircraft. A nationwide class composed of all dealers was certified by the court, pursuant to Rule 23(b)(3), Fed.R.Civ.P., on June 5, 1974. Subsequent developments,

however, reduced the class to a group composed only of "zone dealers," with the period of the claim covering the time from April 14, 1968 to June 5, 1974. Defendants' motion to decertify relates to this remaining class.

informant need not even necessarily be known, 4 *Weinstein's Evidence, supra* at 803–190, since the element of "first-hand knowledge" may be shown by the statement itself or "be inferable from the circumstances." *See* Advisory Committee Note to Rule 803. Nonetheless, the court must be able to determine from some appropriate source—from the document itself, or from external evidence (either direct or circumstantial or both), or from some combination of these things—that this foundational element has been met. *See generally Zenith Radio Corp. v. Matsushita Elec. Ind. Co.,* 505 F.Supp. 1190, 1236 (E.D.Pa.1980).

■ Second, each person involved in transmitting the information, including the original source, must have been acting under a "business duty" to the business activity in question in connection with that transmittal. 4 *Weinstein's Evidence, supra* at 803–185 to 803–192; *McCormick on Evidence, supra.* If there is a break in that series of links, the gap can be bridged only if the transmitting person's statement is admissible under some other hearsay exception. *Id.*

■ The application of this "business duty" test is at the heart of much of the present controversy between the parties. Unfortunately, the test is also the source of a good bit of uncertainty in the case law. It is clear enough, of course, that an employee or agent of the business activity in question will ordinarily be considered as acting under such a "business duty;" and it is equally clear that a mere volunteer or bystander—someone lacking any ongoing business relationship with the business activity—will not be. *See United States v. Pazsint,* 703 F.2d 420, 424 (9th Cir.1983); *United States v. Baker,* 693 F.2d 183, 187–88 (D.C.Cir.1982); *United States v. Davis,* 571 F.2d 1354, 1358–60 (5th Cir.1978); *United States v. Plum,* 558 F.2d 568, 572 (10th Cir.1977); *Florida Canal Industries, Inc. v. Rambo,* 537 F.2d 200, 201–03 (5th Cir.1976); *United States v. Beasley,* 513 F.2d 309, 314 (5th Cir.1975) (decided under

the Federal Business Records Act); *United States v. American Radiator & Stand. San. Corp.,* 433 F.2d 174, 197 (3d Cir.1970) (decided under the Federal Business Records Act); *City of Cleveland v. Cleveland Electric Illuminating Co.,* 538 F.Supp. 1257, 1269–71 (N.D.Ohio 1980). The more difficult problem arises where—as here, with respect to some of the documents in question—there is an ongoing business relationship between two independent business entities, coupled with an obligation on the part of one to report information to the other.

■ An examination of existing case law provides little real analytical guidance, and it appears necessary to turn to general principles. In doing so I note first the basic concept which underpins all the hearsay exceptions addressed in Rule 803: that each embodies "circumstantial guarantees of truthworthiness sufficient to justify nonproduction of the declarant at trial even though he may be available." *See* Advisory Committee Note to Rule 803. As concerns the written reporting of information from an employee or agent to an employer or principal, those "circumstantial guarantees" would appear to be found in certain factors generally presumed to exist in that context: (a) a business interest in obtaining the information on the employer or principal's part, usually expressed by way of some custom, policy or directive and reflected in the employer or principal's reliance on and use of the information, coupled with steps (training programs, audits, etc.) to insure that those requirements are accurately carried out; (b) a corresponding duty on the employee or agent's part to collect and record the information, accompanied by an element of potential detriment to the employee or agent—as by discipline, failure of advancement, termination of relationship, etc.—if the duty is breached; and (c), the general trustworthiness which attends the fact that most employees and agents are loyal and have an interest in

reporting correct business information to their employer or principal.[2]

These same general indicia of trustworthiness, it seems to me, can also be found in *some* situations where the reporting duty arises by way of a continuing business relationship between two independent business entities. For example, a business entity's interest in receiving information can be quite as easily found in a continuing contractual requirement for the same as in a directive to employees, at least when the receiving entity customarily uses and relies on that information. The counterpart element of compulsion and potential sanction as concerns the reporting entity can likewise be found in a continuing contractual requirement, if the requirement is sufficiently specific and if the nature of the information to be furnished is such as to suggest that both entities would attach some significance to the requirement. The third factor does present possible problems; and it is here that one must be particularly careful. The interests of a business entity and its employees or agents generally coincide in this context; those of two independent business entities, even though a contractual or other business relationship exists between them, may not or may do so only to a limited degree. It is that relationship, and in particular the interests and motivation of the reporting entity, which

must be examined with special care. On the other hand there are doubtless many situations in which no real "trustworthiness" problem of this nature will arise, and since the "exceptions" clause of Rule 803(6) ("unless the source of the information or the method or circumstances of preparation indicate lack of trustworthiness") seems quite adequate for treating those which do, any blanket rule of exclusion based solely upon a potential for difficulty in connection with this last factor would appear inappropriate.

The foregoing discussion has undertaken to analyze the question by reference to a *continuing contractual duty* to report, in part because that relationship provides a rather close analogue to the ordinary employer/employee, principal/agent relationship. That is not to say that a continuing contractual relationship is the only conceivable framework for finding a "business duty" outside the ordinary employer/employee, principal/agent situation. When one dispenses with the need for a continuing contractual obligation, however, one risks leaving behind the assurances and rationale which support this aspect of Rule 803(6), and I would be reluctant to venture further afield except where comparable elements of trustworthiness are present.[3]

**2.** I do not suggest that a proponent's foundational proof must ordinarily address each of these factors, as such. They are listed, instead, simply as the ultimate underlying factors which appear to support the business records exception to the hearsay rule.

**3.** It is for this reason I am doubtful of reasoning employed—if not the results reached—in cases such as *Matter of Ollag Construction Equip. Corp.*, 665 F.2d 43, 45–6 (2d Cir.1981) and *United States v. Flom*, 558 F.2d 1179, 1182–83 (5th Cir.1977), particularly in view of the analogous but contrary rulings in *United States v. American Radiator & Stand San. Corp., supra,* and *United States v. Berkowitz,* 429 F.2d 921, 927 (1st Cir.1970) (both decided under the Federal Business Records Act, but not affected for present purposes by that circumstance). The mere fact that a business obtains information from an outside source and "integrates" that information into its own files seems to me, absent some other circumstance, to be an insufficient predicate for Rule 803(6) admissibility. As stated in an older, but influential and still-cited law re-

view article, Note, *Revised Business Entry Statutes: Theory and Practice,* 48 *Columbia L.Rev.* 920, 927 (1948), in connection with a closely-related subject:

> "The mere fact that recordation of third party statements is routine, taken apart from the source of the information recorded, imports no guaranty of the truth of the statements themselves. There is no reason for supposing an intention to make admissible hearsay of this sort. So to construe these statements would make them almost limitless dragnets for the introduction of random, irresponsible testimony beyond the reach of the usual tests for accuracy."

It is possible, however, that where the integrating entity is a "party-opponent," the "integration" of another's information might be treated as an "adoption by use" admission under Rule 801(d)(2)(B), *see* discussion in text, *infra,* or alternatively that the matter might be dealt with under Rule 803(24).

██ I conclude, accordingly, that where there is a binding, continuing contractual requirement for the same, and where the circumstances in that respect as well as the more general circumstances surrounding the entities' relationship do not suggest a lack of trustworthiness, an independent business entity which supplies information to another may in fact be deemed to be acting under a "business duty" for purposes of Rule 803(6). I do not, however, adopt any general extension of that theory to other relationships which lack corresponding "trustworthiness" safeguards. Further, I note that while this approach will generally dispense with the need for introducing and qualifying the reporting entity's own supporting business records, it does *not* eliminate the requirement that the information originate with someone having personal knowledge thereof, who is under a "business duty" to transmit that information to the reporting entity. In those situations where the document itself, or external evidence, or some combination of both does not allow the court to conclude that these requirements are satisfied, exclusion must follow, at least under Rule 803(6).

### B.

### *Rule 801(d)(2).*

As noted, plaintiffs suggest that some or all of the items in Category I may also be received as adoptive, authorized or vicarious admissions of a party opponent under Rule 801(d)(2)(B), (C) or (D). Rule 801(d), of course, excludes such matters from its definition of hearsay.

Plaintiffs' "adoptive" admissions theory appears to be premised upon two distinct arguments, as applicable to various documents: (a) that if a statement was made to a defendant by an outside source, and was not responded to, an "admission by silence" occurred; or (b) that if information was furnished to a defendant from an outside source, and was acted upon or used by that defendant, it was thereby adopted. Plaintiffs' authorized or vicarious admissions argument appears based on the theory that a reference to or inclusion of infor-

mation from an outside source, in a document authored by an employee of a defendant, represents a "statement" of such information by the employee which he was either authorized to make or which concerned matters within the scope of his employment.

I begin again with the observation that the mere existence of a document in a party's files does not, without more, necessarily stamp the statements in the document as admissions attributable to that party within the scope of Rule 801(d)(2). Under any of plaintiffs' theories, something more must be shown.

██ Specifically, with respect to any variety of an "adoptive" admission the surrounding circumstances must demonstrate that the party "has manifested his adoption or belief in ... [the truth of the statement]." *See* Advisory Committee Note to Rule 801. That is, "the burden of proof is on the proponent to show that the conduct was intended as an adoption of the statement." *Zenith Radio Corp. v. Matsushita Ind. Co., supra* at 1243; 4 *Weinstein's Evidence, supra* at 801–199. Accordingly, the mere fact that the party has acted (or failed to act, in the case of an admission by silence) in some way in reference to the statement or information (as by repeating it or retaining it) is not sufficient, standing alone, to justify a finding that there has been an adoption. *See generally McCormick on Evidence, supra* at 649. Instead, the surrounding circumstances, including the circumstances and nature of the underlying statement itself, must be examined to determine whether an intent to adopt the statement is fairly reflected by the act or failure to act which is in question.

██ With respect to the "adoption by use" theory advanced by plaintiffs, the foregoing requirement presents some particularly troublesome problems. There is no doubt that where a party's use of a document supplied by another in fact represents the party's intended assertion of the truth of the information therein, an adoptive admission can be found. *See general-*

ly IV *Wigmore on Evidence* § 1073, at 138–40 (Chadbourn ed. 1972); *McCormick on Evidence, supra* at 649–51. Situations of this sort are most commonly encountered where the party forwards the document to another in response to some request (or perceived need) for information of the sort contained in the document. *See, e.g., Courtney v. Courtney,* 542 P.2d 164 (Alaska 1975); *Cherney v. Board of Education,* 31 A.D.2d 764, 297 N.Y.S.2d 668 (1969); *People v. Burgess,* 244 N.Y. 472, 155 N.E. 745 (1925); and *cf.* IV *Wigmore on Evidence, supra,* and *McCormick on Evidence, supra,* and cases cited therein. Where, however, the document (or information from it) is merely used in some internal fashion by the party, the situation may need to be viewed rather differently. This is not by virtue of any requirement that the matter be communicated to another, *see Zenith Radio Corp. v. Matsushita Ind. Co., supra* at 1242, but results from more practical concerns. Both individuals and businesses inevitably assimilate and to some degree "use"—for one reason or another, and for one purpose or another—information from an enormous variety of outside sources. That, indeed, is the stuff of our daily lives; yet it would seem highly unrealistic to suggest that each of these innumerable occasions should be viewed as representing an "adoptive" admission of the truth of the information.[4]

■ On balance, it seems appropriate to suggest that before this sort of internalized "use" of information from another can be qualified as an adoptive admission, it must be shown that the party acted (or failed to act) in some *significant, identifiable way, in direct reliance upon the specific information in question,* so as to demonstrate clearly the party's belief in

and intentional adoption of that information. Such a finding will most often be possible where the party has actively requested or sought out the specific information in question, although I do not conceive this factor to be either a *sine qua non* to admissibility or an appropriate basis, standing alone, for admissibility.

■ Turning next to the admissions by silence which plaintiffs claim, there are two other qualifications of particular significance. First, and quite obviously, the fact of silence or non-response must itself be shown as a part of the proponent's proof. It is not sufficient merely to establish that a communication was received by a party-opponent, or to suggest that the party-opponent should prove the fact of a response if it claims there was one. Second, the statement must deal with a matter within the personal knowledge of the party-opponent.[5] *McCormick on Evidence, supra* at 653. This is so even if Rule 801(d) is viewed as having generally dispensed with the requirement of first hand knowledge in connection with admissions, *see Mahlandt v. Wild Canid Survival & Research Center, Inc.,* 588 F.2d 626, 630–31 (8th Cir. 1978), for the reasons so well expressed in *McCormick, supra:*

"At first glance, this requirement may appear inconsistent with the general dispensation with firsthand knowledge with respect to admissions, yet the unreasonableness of expecting a person to deny a matter of which he is unaware seems evident; he simply does not have the incentive or wherewithal to embark upon a dispute."

■ Finally, with regard to "authorized" or "vicarious" admissions under sub-

---

**4.** The problems in this area could be eliminated by holding, as Weinstein espouses, *see* 4 *Weinstein's Evidence, supra* at 801–156 to 801–158, 801–164, that a Rule 801(d)(2) admission must relate to something which is within the party-opponent's personal knowledge. The Eighth Circuit has squarely ruled to the contrary, however, *see Mahlandt v. Wild Canid Survival & Research Center, Inc., infra* at 630, and I am of course obligated to follow that ruling. I have noted an exception, *see* text *infra,* in the case of

an admission "by silence;" an exception I believe the *Mahlandt* case itself would allow.

**5.** In the present sort of context, I take this to mean that the matter must be within the personal knowledge of the employee to whom the statement was made, or of other company personnel to whom the matter was referred or reported.

sections (C) and (D) respectively, there are two other factors of potential importance in this case. The first is found in the requirement that the agent or servant's "statement" must amount to an *intended assertion of the fact of the matter* by the speaker, rather than being a mere repetition of another's assertion. *Zenith Radio Corp. v. Matsushita Elec. Ind. Co., supra* at 1240–42; and *see also Mahlandt v. Wild Canid Survival Research Center, Inc., supra* at 630. Second, although the necessary proof may certainly be circumstantial, there must be an adequate foundational showing, as to subsection (C), that the agent or servant was in fact authorized to make the statement in question, or as to subsection (D), that the subject of the statement "concerned a matter" which was within scope of the speaker's agency or employment. Merely showing that a statement was made by one who is identified generally as an agent or employee of the party, without some further proof as to the extent of his authority to make the statement (for purposes of subsection (C)) or as to the scope of his employment (for purposes of subsection (D)), establishes neither. *See generally Zenith Radio Corp. v. Matsushita Elec. Ind. Co., supra* at 1245–47.

### C.

#### Rulings.

Although a specific ruling for each item in Category I is set forth in the Appendix to this Order, some explanation of those rulings—collectively with respect to documents which can be dealt with as a group, or on a demonstrative basis for those which cannot—is in order. Plaintiffs' five proposed subcategories provide a convenient format.

The "Status Reports" (Plt.Ex. # 49) are a collection of forms maintained by Cessna with respect to each aircraft manufactured and sold by it. Each form contains a number of columns to indicate the status of a given aircraft from month to month while in a distributor's hands (e.g., "Zone Inventory," "Zone Demonstra-

tor"), and while in the hands of a dealer (e.g., "Dealer Inventory," "Dealer Demonstrator"), to the point of ultimate sale to some customer other than a contracted dealer of the distributor (defined, in the legend on the form, as a "retail" sale). Although Cessna prepared the blank forms, and filled in the pertinent identifying information for the aircraft as well as the name of the distributor to whom sold, the remaining information was supplied by the distributor or dealer as the case might be. The completed form was then returned to Cessna and retained by it. The standard Cessna/distributor contract required the reporting of this information, as did the standard form distributor/dealer contract made available by Cessna for use by its distributors. This reporting practice was carried on for a number of years, during which time the information from the forms was actively used by Cessna in planning its future production schedules.

Given the above the objection to these exhibits will be overruled. The surrounding circumstances, and Cessna's active use of the information from the documents, qualifies them (with respect to the information supplied by the distributors and dealers) as adoptive admissions by Cessna under the tests set forth above for an adoption by use. Further, in those instances where the record shows a continuing contractual commitment to supply the information, both by the dealer to the distributor and by the distributor to Cessna (there are several of these contracts in evidence, although by no means all), the forms would be admissible under Rule 803(6) pursuant to the tests outlined above. While Cessna argues that there is a lack of "trustworthiness" because the information was not always current and because the precise status of an aircraft in a dealer's hands was sometimes mis-reported, that is not as such an appropriate basis for objection with respect to Rule 801(d)(2)(B); nor do I find the problems in this respect of sufficient magnitude to require exclusion under Rule 803(6) in those instances where the documents are admissible under that Rule.

Plaintiffs' second subcategory of items consists of the "Cessna Finance Company Files" (Plt.Ex. # 215–231). These are files which were maintained by defendant Cessna Finance Company (hereinafter "CFC") in connection with extensions of credit made by it to Cessna's various contracted distributors. Each file contains, for a particular distributor, a substantial volume of widely different kinds of documents ranging from in-house CFC memoranda to Dun and Bradstreet reports and clippings from magazine stories or news articles.

Dealing with these exhibits presents something of an administrative problem, particularly since plaintiffs have made no designation with respect to the individual items, or portions of items, they actually seek to use. Given that fact, and the fact that many items are quite clearly of no use to plaintiffs for any conceivable purpose, it would be quite pointless to attempt to deal with them on an individualized basis.

 Recognizing this difficulty, plaintiffs have suggested that I deal instead with the items in only one file (Plt.Ex. # 224), as a sort of bench test. The general theory is sensible, but since plaintiffs have made no specific selections even from that file the exercise remains perhaps more complicated than it truly need be. Accordingly, while the Appendix to this Order contains a specific ruling as to each item in Exhibit # 224, I will limit my remarks here to the Dun and Bradstreet report contained in that file (Exhibit # 224–R), and to the additional general observation that where the source of a document is not reasonably apparent either from the document itself or from the foundational testimony, admissibility under either Rule 803(6) or Rule 801(d)(2) is automatically precluded. *See Zenith Radio Corp. v. Matsushita Elec. Ind. Co., supra* at 1306–08.

 Given the principles outlined previously, the Dun and Bradstreet report found in Exhibit # 224 cannot very well qualify under Rule 803(6), since the information contained therein is not shown to have originated with a source which had both first hand knowledge thereof and a business duty to report that information to Dun and Bradstreet. Nor, for that matter, is Dun and Bradstreet shown to have had any continuing contractual duty to submit such information to CFC. Furthermore, although there was testimony that CFC "relied upon" the materials in the file—including presumably the Dun and Bradstreet report—in its decisions to extend or withhold credit, that sort of foundation is far too general to support a finding that any specific item of information therein was adopted "by use" and thus became an admission by CFC under Rule 801(d)(2)(B).[6]

The documents in plaintiff's third subcategory are the CFC "ledger cards" (Plt.Ex. # 1406). As the name suggests, these are individual cards maintained by CFC regarding each extension of credit made by it, showing the status of the loan account and certain related information (name of borrower, the plane upon which the loan was made, etc.). The cards are clearly business records of CFC within the scope of Rule 803(6); the only dispute concerns the significance of the word "retail" which appears on them.

 The foundation testimony regarding the cards establishes that the word "retail" was placed on a card whenever the request for the loan was accompanied by a form designated as a "retail" credit application. How such forms differed from a "wholesale" credit application (or some other form of application) is unclear, and perhaps unimportant for present purposes. The meaning of the term *as used on the cards* is clear enough, and defendant's objection thereto will be overruled. I note, however, that I take this item of information for no more than the foundation testi-

---

**6.** As with most Dun and Bradstreet reports with which the writer is familiar, this one contains an extremely wide-ranging variety of information. The extent to which CFC relied upon any specific portions thereof is unknown, and without more I am unwilling to accept the idea that *all* of the information was relied on, or to attempt a guess as to which specific items might have been.

mony establishes. That is, such an entry tells me only that an application for credit was made on a "retail" credit application form, and does not itself establish that the underlying sale was in fact a sale within any of the varied definitions of "retail" proposed by the parties and the witnesses.

For ease in ruling I have redefined plaintiff's fourth subcategory to include only those items of correspondence directed to a defendant, from sources outside that defendant, as to which the record is silent with respect to whether a reply was made (Items 13, 14, 15, 21, 28, 39, 42, 45, 56, 57, 58 and 62). Plaintiffs' Exhibit # 332 (Item 14) is typical, consisting of a letter from one Gordon Newstrom, as President of "Mesaba Aviation," to Frank Martin, Vice President of Cessna, detailing Mr. Newstrom's disillusionment with "a lot of strange things going on around this country as far as Cessna aircraft is concerned." Included among those things is information "discovered" by Mr. Newstrom about the buying and selling activities of another dealer, and the "common knowledge" that persons (presumably ultimate end users) wishing to purchase a plane could do so "through the Omaha distributorship at $200.00 to $400.00 over dealer cost."

■ The document—as with all those in this subcategory—is clearly hearsay. For Rule 803(6) purposes as concerns Cessna the author is neither a person with first-hand knowledge of many of the things he reports, nor in any event a person shown to be operating under a "business duty" to report them to Cessna. Neither can Mr. Newstrom or his company appropriately be considered an "agent or servant" of Cessna for purposes of Rule 801(d)(2)(C) or (D). Finally, the item does not reflect any sort of an adoptive admission by Cessna under Rule 801(d)(2)(B): the fact of Cessna's silence is not shown, and even if it were there is no demonstration that Mr. Martin had personal knowledge of the matters related, as would be required for an admission "by silence;" nor is there any indication that Cessna relied and acted upon the information in any identifiable way.

The final group of items in Category I consist of various documents authored by Cessna personnel, either in response to correspondence or telephone calls from persons outside Cessna or as memoranda "to the file" concerning various contracted distributors and their activities. One example of each sort of document will suffice to demonstrate the rather narrow and difficult distinctions which must be drawn.

■ Plaintiff's Exhibit # 65 (Item 5) is composed of a letter from one Lawrence Blum, addressed to the Director of Public Relations of Cessna, and a response thereto from Richard Robinson, General Sales Manager of Cessna. In his letter, Mr. Blum—apparently not an aircraft dealer or distributor of any sort—complains with respect to his efforts to purchase a Cessna aircraft from a Cessna dealer in Chicago, and of a misunderstanding over the price thereof. Mr. Robinson's response demonstrates that the letter was forwarded to him for reply, and that he had discussed the complaint with personnel of the dealer and distributor involved. The response continues on to explain the reason for the misunderstanding, as Mr. Robinson understood it from his discussions with the dealer and distributor.

Taken in isolation from the response thereto, Mr. Blum's letter must be considered hearsay for the same reasons given in connection with Plaintiff's Exhibit # 332. Further, even the response cannot qualify as a Cessna business record under Rule 803(6), since it is clear that Mr. Robinson lacked any first hand knowledge of the events in question and since it is not clear that the individuals from whom Mr. Robinson obtained his information had first-hand knowledge or were under any "business duty" to report that information to Mr. Robinson. On the other hand, since Cessna's internal referral of the letter to Robinson rather convincingly demonstrates that he had both the authority to speak for Cessna on the subject and that the subject was within the scope of his employment,

his response could arguably stand as an authorized or vicarious admission under Rule 801(d)(2)(C) or (D). To the extent either of those propositions are so, the contents of Mr. Blum's letter may likewise be admissible as part of the necessary context of the matter.

■ The inquiry in connection with 801(d)(2)(C) or (D) admissibility is whether the response, or any specific part of it, can fairly be read as affirmative *assertion* by Mr. Robinson of the facts in question, rather than as a mere repetition of assertions by others. In this particular instance, although the point may be viewed as close, I conclude that the second, third and fourth sentences of the response fall into the latter category. Put shortly, it appears to me that those sentences represent no more than Mr. Robinson's repetition (perhaps to some extent in paraphrased form) of remarks made to him by the distributor and dealer. As concerns those sentences (and any related part of Mr. Blum's letter) the objection will be sustained. On the other hand, the fifth and sixth sentences of the response seem to be of the opposite character, and I will overrule the objection with respect to those sentences as well as to the portion of Mr. Blum's letter (but only that portion) necessary to give them meaning.

The second sort of document mentioned above is typified by Plaintiff's Exhibit # 181 (Item 10). This is a document styled "Call Report," prepared by Cessna's Regional Manager, Dick Dewey, in reference to the activities of D.A.D., Inc. (a Cessna distributor). A variety of information is set forth therein regarding D.A.D.'s organization, personnel, attitude and business operations. Defendants' objection goes to the second page, titled "Affiliated Organizations."

■ The documents make clear that Mr. Dewey lacked any first hand knowledge of most of the matters reported. Nor is there any showing that his sources had a business duty to report those things to Cessna. Admissibility under Rule 803(6) thus appears to be eliminated. As with the preceding exhibit, however, Rule 801(d)(2)(C) or (D) provides an alternative basis for admitting at least some of the statements in the report. Under that theory defendants' objection will be sustained as to the first paragraph of the second page, and overruled as to all remaining paragraphs. Again the question is close, but I take the first paragraph, regardless of its sometimes affirmative phraseology, to be essentially a repetition of the statements of others rather than an independently evaluated assertion of the writer (even though based on the reports of others). The remaining paragraphs, however, even though obviously not based upon Mr. Dewey's first hand knowledge, strike me in the opposite fashion—that is, as *his assertion* of the facts stated, rather than a mere neutral reporting of the comments of others. Given D.A.D.'s location within Mr. Dewey's area of responsibility, and Mr. Dewey's position as the Cessna manager of that region, I believe the requirements of Rule 801(d)(2)(D) are satisfied.

As the foregoing may suggest, it is impossible to deal with many of the documents in this final subcategory except on a statement by statement basis. The rulings in the Appendix undertake to do so, but a few final words of explanation are in order. First, in those instances where only a portion of a document has been admitted, the "Ruling" column of the Appendix will state, "See attached exhibit." A copy of the exhibit will in turn be attached, with the *admitted* portions thereof highlighted in yellow marker. Second, I have not undertaken to rule upon any statement which appears to lack relevance to any issue in this case, even though the statement—in the abstract—might represent an "admission." Third, where the source of a document is not reasonably apparent either from the document itself or the foundational testimony, the objection to the entire document will be sustained. Finally, although most of the items in this final subcategory could be admitted, if at all, only under Rule 801(d)(2)(C) or (D), a few can be received under some hearsay exception. In those latter instances the document has

been dealt with accordingly, even though the Appendix does not reflect the precise basis for the ruling.

## II.

### CATEGORY II.

The items in Category II are made up of a number of documents offered by plaintiffs during trial, together with three exhibits offered by defendants, which were not listed as exhibits prior to trial in accordance with any of the versions of the court's Final Pretrial Order (the first being dated July 28, 1980). The relevant questions are of a practical rather than legal nature, and involve a balancing of the following considerations: (a) the relative importance of the item; (b) the reasons for failure to list the item, including particularly (but not limited to) whether there appears to be any element of bad faith or "sandbagging;" (c) the degree of prejudice to the objecting party, particularly in terms of that party's ability to respond to the item; and (d), the extent to which orderly trial proceedings would be disrupted by admission of the item. *See generally Spray-Rite Service Corp. v. Monsanto Co.*, 684 F.2d 1226, 1245 (7th Cir.1982), *aff'd* —— U.S. ——, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). In a bench tried case such as the present one, however, I consider the last item to be of less importance, relatively speaking, than the other three, given the flexibility which generally attends a bench trial.

With the above factors in mind defendants' objection to the offer of plaintiffs' Exhibits # 1438 and 1439 will be sustained, while defendants' objection to plaintiffs' Exhibits # 1441, 1442, 1443, 1335–A, 1335–B, 1455, 1459 and 1460 (as amended), and plaintiffs' objection to defendants' Exhibits M–37, M–38, M–39 and M–40, will be overruled.

## III.

### CATEGORY III.

The documents in this category are comprised of certain "10–K" forms filed by Walston Aviation, Inc. ("Walston") with the Securities and Exchange Commission pursuant to § 15(d) of the Securities Exchange Act of 1934; a prospectus filed by Walston with the Securities Exchange Commission in connection with a 1965 debenture issue by Walston; and certain minutes of the meetings of the Walston Board of Directors. Plaintiffs suggest that the first two kinds of documents are admissible under Rule 803(17), dealing with "market reports and commercial publications," and that the Walston Board minutes have been appropriately authenticated and qualified as business records under Rule 803(6).

Neither party cites any direct authority bearing on the applicability of Rule 803(17) to such things as a prospectus or "10–K" forms, and the court's independent research has revealed none. Lacking any guidance of that sort there is little choice but to turn to a general analysis of the rule, difficult and frustrating as that task may prove to be.

The bare language of the rule itself may provide some assistance. It speaks of "[m]arket quotations, tabulations, lists, directories or other *published compilations....*" (emphasis added). This wording suggests that the item should be "published," in the sense that it is in written form and circulated for use by others, and that it should be a collection of data or information. That much is reflected in the common law antecedents of the rule, *see generally VI Wigmore on Evidence, supra* §§ 1702–1708, and without more argues for the rejection of the Walston "10–K" forms since those items were simply filed with the Securities and Exchange Commission, not circulated or "published" in the sense referred to above.[7]

The Walston prospectus presents a more difficult problem. Given what seem to be the general principles of

---

**7.** The mere fact that those documents were filed with the Commission does nothing itself to enhance their admissibility under the instant rule.

Rule 803(17), however, I conclude that the prospectus is not covered thereby. It is true that the document probably satisfies the first of the two basic factors which underpin both the rule and its common law counterpart: "necessity," in the sense that it would be a "great practical inconvenience [to summon] each individual whose personal knowledge has gone to make up the final result." *See VI Wigmore on Evidence, supra* at 38; 4 *Weinstein's Evidence, supra* at 803–316. In fact even the second basic factor—"trustworthiness," as demonstrated through "general reliance by the public or by a particular segment of it, and the motivation of the compiler to foster reliance by being accurate"—*see* Advisory Committee Note to Rule 803(17), might seem to be present in a general sense. As Weinstein notes, however, 4 *Weinstein's Evidence, supra* at 803–175:

> "Publications such as market quotations in newspapers, life expectancy tables, animal pedigrees, and directories state readily ascertained facts about which there can be no real dispute. Admitting them without the possibility of cross-examining the persons who supplied the data makes little difference. On the other hand, there are publications upon which the public or persons in particular occupations rely, and which fit within the literal language of this rule, which are not concerned with simple objective facts. Whether they meet the requisite standard of trustworthiness ... can best be seen by considering the various types of publications to which courts and commentators have suggested this exception should be extended."

That appraisal, once made, in turn suggests that the kinds of publications contemplated by the rule are those which deal with compilations of relatively straightforward *objective facts not requiring, for their statement, a subjective analysis of other facts. See generally VI Wigmore on Evidence, supra* and cases cited there-

in; 4 *Weinstein's Evidence, supra,* and cases cited therein. While certain of the information in the Walston prospectus may be of this nature, e.g., stock ownership and ownership of subsidiary companies, the majority—including that in which plaintiffs seem most interested—is not.[8]

■ Defendant's objection to the Walston Board minutes must also be sustained. The only foundation with respect to those items—offered as business records under Rule 803(6)—comes from an individual who was not present at any of the meetings, or even a member of the board, and who simply identified some of the signatures to the minutes as being those of board members. The latter testimony may be sufficient to *authenticate* the documents under Rule 901(b)(2) (*viz,* as being what plaintiffs claim they are: minutes of the board), but is wholly insufficient to establish the *foundation* elements necessary to render them admissible under Rule 803(6). *See* Advisory Committee Note to Rule 901; *Zenith Radio Corp. v. Matsushita Elec. Ind. Co., supra* at 1220–22.

## IV.

### CATEGORY IV.

Category IV involves a number of summaries of aircraft sales by distributors, offered by plaintiffs under Rule 1006. A review of the principles relating to such evidence will be helpful.

■ As Weinstein points out, 5 *Weinstein's Evidence, supra* at 1006–15 to 1006–17, there is a distinction between a Rule 1006 summary and a so-called "pedagogical" summary. The former is admitted as substantive evidence, without requiring that the underlying documents themselves be in evidence; the latter is simply a demonstrative aid which undertakes to summarize or organize other evidence already admitted. *Id.* I note, however, that a pedagogical summary can itself be admit-

---

**8.** It is conceivable that the prospectus could be treated as one of those documents which are admissible under Rule 803(6) without the usual foundation testimony. *See Zenith Radio Corp.* *v. Matsushita Elec. Ind. Co., supra* at 1234–36. The issue has not been raised or briefed, however, and I do not rule it here.

ted in evidence where the trier of fact will find it helpful and will not be unduly influenced thereby. *See,* e.g., *United States v. Gardner,* 611 F.2d 770, 776 (9th Cir.1980); *United States v. Scales,* 594 F.2d 558, 563 (6th Cir.), *cert. den.* 441 U.S. 946, 99 S.Ct. 2168, 60 L.Ed.2d 1049 (1979). The latter point is made here because some things can be done with a pedagogical summary which cannot be done with a Rule 1006 summary,[9] and because some of the summaries in this case partake of the nature of both.

■ There are four primary criteria to be satisfied in connection with a Rule 1006 summary. First, the summary must be of "voluminous writings, recordings or photographs which cannot conveniently be examined in court." *See* Rule 1006. This statement makes clear that the volume of the underlying documents is an important factor to be considered by the court, although I believe considerable discretion exists in that respect. Perhaps more importantly, the statement also makes clear that only "writings, recordings or photographs" may be the subject of a Rule 1006 summary. Accordingly, a Rule 1006 summary cannot properly incorporate a witness' personal knowledge as the basis for any of the matters summarized. 5 *Weinstein's Evidence, supra* at 1006–8 to 1006–9, and cases cited therein.

■ Second, although not expressly stated by the rule, it is clear that the proponent of the summary must establish that the underlying "writings, recordings or photographs" are themselves admiss*ible* in evidence, *Ford Motor Co. v. Auto Supply Co.,* 661 F.2d 1171, 1175 (8th Cir.1981); *Boyd v. Ozark Airlines, Inc.,* 419 F.Supp. 1061, 1065 (E.D.Mo.1976), *aff'd* 568 F.2d 50 (8th Cir.1977); 5 *Weinstein's Evidence, supra* at 1006–7 to 1006–9, since otherwise the rule would tend to become a vehicle for the avoidance of all other evidentiary limi-

tations. Thus the same general foundation must be laid as if the underlying materials were actually being offered in evidence, minus of course the sort of item by item in-court identification which ordinarily attends that process.

■ Third, the originals or duplicates of the underlying materials must be made available for examination or copying by the other parties, at a reasonable time and place. *See* Rule 1006.[10] Accordingly, if those underlying materials are unavailable (as by loss or destruction), the requirements of Rule 1006 itself cannot be met. In that situation, however, the summary can still be admitted as "secondary" evidence of the underlying materials if the requirements of Rule 1004 or Rule 1005 (as applicable) are satisfied. 5 *Weinstein's Evidence, supra* at 1006–11. Where some of the underlying materials are available and some unavailable, the summary can be admitted partly under Rule 1006 and partly under Rules 1004 or 1005. *Id.*

■ Finally, although again not expressly mentioned by the rule, it is obvious that a summary must be an *accurate* summarization of the underlying materials involved. *See Needham v. White Laboratories, Inc.,* 639 F.2d 394, 403 (7th Cir.1981); *United States v. Scales, supra; United States v. Denton,* 556 F.2d 811, 815–16 (6th Cir.1977). Once an appropriate foundation has been established, however, this requirement must be approached sensibly, particularly with summaries of the present sort, since some human error in transcribing or collating a "voluminous" mass of figures, dates and names is practically inevitable. No hard and fast rules can be established; one can only be guided by the relative significance and frequency of any demonstrated error.

---

**9.** For example, a pedagogical summary can be used to summarize particular points of testimony by a witness or by several witnesses. *See* 5 *Weinstein's Evidence, supra* at 1006–15 to 1006–16, and cases cited therein.

**10.** Ordinarily that "reasonable time" will be at some point before trial, since the object is to give opposing counsel a meaningful opportunity to prepare challenges to the materials; although it would be within the trial court's discretion to permit the matter to be dealt with during trial. 5 *Weinstein's Evidence, supra* at 1006–10.

## A.

*Item 83: Plaintiffs' Exhibit #300.*

Plaintiffs' Exhibit #300 is a summary of various items of information concerning aircraft purchases and sales made over several years by Florida Air Distributors, Inc. ("FAD"), a contracted Cessna distributor located in Fort Lauderdale, Florida. The exhibit was authenticated by Mr. Richard Hoster, secretary-treasurer of the company during the time involved. According to Mr. Hoster, he prepared the exhibit in approximately 1973 at the request of FAD's corporate counsel. In doing so—with one exception to be mentioned shortly—he worked from the individual aircraft files maintained by FAD. In general, an appropriate foundation was laid showing those files to be business records of FAD within the meaning of Rule 803(6). Some of the files were subsequently lost, however, and have not been available for recent examination by defendants' counsel.[11]

Defendants object, first, to the fact that the summary undertakes to divide FAD's sales into four categories based upon the nature of the purchaser: "Dealers With Written Agreements"; "Dealers with Oral Agreements"; "Other Distributors"; and "Recap-Other Sales." Particular concern is expressed over the fact that the last mentioned category might be taken by the court as establishing, without any further proof, that the purchasers in that category were ultimate end users of the aircraft.

While defendants' concern over the implications of the last category does not trouble me, since I could not and would not accept the category, without more, as representing anything beyond that expressed by its title—*viz.*, sales to someone who did

not fall within the preceding three categories—defendants' more general objection must be sustained. It is clear from Mr. Hoster's testimony that information as to the status of the purchaser—in the respects dealt with by the above categorization—was not information contained within the files he was summarizing. Of equal if not greater importance, given the possibility that this aspect of the summary could conceivably be treated as a pedagogical summary if there existed other evidence of record to support it, is the fact that the necessary information is not contained elsewhere in the record, and in fact was not even within Mr. Hoster's personal knowledge in most instances. Rather, he obtained the information (at least according to him) by asking the company's general manager. That sort of information would be inappropriate for inclusion in any kind of a summary, as such; and I will accordingly strike the categorizations and treat the document as imparting no information concerning the nature of the purchaser. In a bench tried case such as this, however, there is no need that I strike the entire exhibit on this account.

Defendants also note the fact that a number of the underlying aircraft files are now missing (estimated to be approximately 25% of the total included in the summary), and that they have not had a meaningful ability to examine those files. As the preceding statement of general principles would suggest, however, to the extent the exhibit summarizes information from those missing files it can and will be admitted under Rule 1004(1), there being no indication that plaintiffs were responsible for the loss or destruction of the files, much less that they acted in "bad faith" in

---

**11.** The files apparently remained intact at least until 1973, when Cessna purchased FAD. A few months thereafter the files were shipped to Cessna's headquarters in Wichita, Kansas. At some time thereafter the files were turned over to plaintiffs' counsel in connection with discovery in this case. At what point the missing files were lost is unknown, but there is no suggestion that any party acted intentionally or in bad faith in connection therewith.

Defense counsel presumably had an opportunity to inspect the files while they were in Cessna's hands, as well as thereafter. Whether defendants had Exhibit #300 in hand before the files were lost, however, is unclear; and I would not, at least in this case, consider their opportunity to examine the files "meaningful" in the absence of the summary. I acknowledge, of course, that Rule 1006 refers only to an examination or copying of the underlying materials, not the summary itself.

connection therewith. It is not necessary, given the fact that the exhibit's categorization has been eliminated, that I know which specific files are missing.

Defendants further point out that the last three columns on each page of the exhibit—"Factory Suggested Retail" price, "Factory Suggested Dealer" price and "Factory Suggested Distributor" price— are simply that, and do not necessarily reflect the actual price paid by FAD, a dealer or anyone else with respect to a specific plane. Mr. Hoster's testimony bears out that assertion, and I will accept the figures under those columns as representing only the "factory suggested" price (for whatever use that information may be) as opposed to the actual price paid. I note, however, that this ruling does not affect column 9 of the exhibit, which purports to show the actual price for which FAD sold the aircraft.

Finally, in specific connection with this last point, defendants urge that the record shows a number of errors as between the sales price figure listed under column 9 and the actual sales price figure reflected by the aircraft file itself. The point is troublesome as a general matter, but since the problem is limited (so far as the record was developed) to the last 42 entries on the exhibit (the "Other Sales" category), I will continue to treat the matter as I did at trial. That is, I will simply strike each individual sales price figure shown to have been incorrect, and will treat the others as accurate. I might not ordinarily condone that approach, but it seems reasonable here since the entries of concern to defendants are small enough in number to be dealt with individually and since the magnitude of price error, per individual entry, appears relatively insignificant. There is a further problem, of course, in the fact that an estimated 25% of the files applicable to those 42 entries are missing. Even if I assume the same error rate might exist as to those files, however, the circumstances noted above would not appear to justify striking all the column 9 price figures for those 42 entries, much less for the entire 757 entries in the exhibit.

### B.

*Item 81: Plaintiffs' Exhibits # 168, 169, 170, 171 and 172.*

Plaintiffs' Exhibits 168–172, inclusive, are a series of computer summaries which undertake to portray certain information regarding aircraft sales by five distributors (Skyways, Ragsdale, Skyways Aircredit, Airflite and Yingling) to entities designated on the summary cover as "captive dealers" or "non-Cessna dealers." Those summaries are based upon information—itself summarized—contained in what plaintiffs refer to as "spread sheets." The latter documents were prepared by personnel employed by plaintiffs' counsel, working from data contained in the Status Reports maintained by Cessna, the CFC files maintained with respect to aircraft financed by CFC, invoices from Cessna to the distributor as maintained in Cessna's files, and Cessna's warranty records.

Defendants object, first, on the basis that some of the underlying documents used to make up the "spread sheets" should be held inadmissible. As concerns the Status Reports and CFC files, defendants' objections have been dealt with elsewhere and overruled, thus furnishing no basis for objection here. And of course defendants do not contest the admissibility of Cessna's own invoices to the distributors, or Cessna's warranty records. This objection to Exhibits # 168–172 will accordingly be overruled.

Defendants next point out that each of the exhibits bears a cover page which labels the exhibit as a "Schedule of Captive Dealer Purchases and/or Distributor Purchases Concerning Aircraft Sold to Non-Cessna Dealers," even though in many instances the exhibit lists the purchasing dealer as "unknown," and even though there is no showing that any of the underlying source records contained information which would allow such a categorization to be made. The point is well taken. The cover page of each exhibit will accordingly

be stricken, and the court will draw no inference of any kind with respect to "unknown" purchasers.

Defendants also note that the underlying source documents used to prepare the "spread sheets," and in turn the present exhibits, furnish a dealer purchase price for only about 30 to 40 percent of the aircraft listed (a point admitted by Ms. Skinner, the person in charge of the preparation of the "spread sheets"), although the exhibits themselves undertake to set forth a dealer purchase price for every aircraft. From plaintiffs' counsels' representations to the court, it appears those missing figures were supplied simply by adding six percent to the distributor's purchase price for the aircraft, that six percent figure representing—arguably—[12] the difference between the general factory suggested distributor price and the general factory suggested dealer price. Further, as defendants point out and plaintiffs concede, there is no way to distinguish between those entries which reflect a dealer purchase price which was actually taken from source documents and those which reflect a dealer price which was simply "made up" by way of the above six percent calculation.

■■■ Again, I believe defendants' point is well taken. Whether there might be any value in a summary which simply reflected the factory suggested dealer price is doubtful; but it is clear in any event that the present summaries are offered as showing the price actually paid by a dealer for an aircraft. It is also clear that the price paid was not always the factory suggested price. Given all this, the resulting inseparable mix of apples and oranges makes this entire category of information unusable. The dealer price information set forth in Exhibits #168–172 will accordingly be stricken.

■■■ Finally, defendants suggest that some of the distributor purchase price figures reflected in the summaries are suspect. At issue are those instances where a

"spread sheet," under the column for distributor purchase price, reflects both a "price" *and* an amount for "modification" or "special handling" (a figure which is significant in dollar terms). According to Ms. Skinner, it is unknown at this time whether the "price" shown includes or excludes the modification or special handling charges. In such instances it is thus impossible to determine whether the distributor price figure carried forward into the present summaries is the correct figure.

Again, I believe defendants' point is well taken. If the distributor "price" is of interest here, presumably it is so only with respect to the *actual* price paid by the distributor, including modification and special handling charges, since otherwise there is no meaningful basis for comparison with the dealer price or any other price. Further, since the "spread sheets" from which these summaries were prepared are not in evidence, there is no way to determine which entries are potentially affected by modification and special handling charges and which are not. In the circumstances there appears to be no alternative except to strike all of the "distributor price" figures shown in the exhibits.

In a jury tried case these problems would rather obviously dictate that each of the present exhibits be held inadmissible in its entirety, unless the offending information could be blocked out. In a bench tried case, however, there is no need that I carry matters to that extent since there may be some conceivable use for the remaining information. I will accordingly admit Exhibits #168 to 172, inclusive, for whatever use they may serve when shorn of the items of information referred to above.

C.

*Items 82 and 84: Plaintiffs' Exhibits # 560, 562, 563, 564, 565, 566, 567, 568 and 1361.*

Plaintiffs' Exhibits #560 to 568, inclusive, together with #1361, are counter-

---

**12.** During some periods of time the distributor/dealer price differential may have been 5% rather than 6%.

parts of Exhibits # 168 to 172, except that they purport to summarize sales by Cessna's independent distributors to their contracted dealers (as opposed to dealers owned by them, or other dealers). The exhibits were prepared in the same way and from the same sources as Exhibits # 168 to 172, and for that reason are of course subject to similar difficulties. The same rulings will thus be applied to them; *viz*, the information on the cover page, the "dealer price" information (except for that which can be traced to remaining information in plaintiffs' Exhibit # 300), and the "distributor price" information will be stricken.

With these excisions it is doubtful that the present summaries serve any relevant purpose, particularly given the existing structure of the case. Plaintiffs seem to feel, however, that some useful general market information may be obtained from the exhibits, presumably even in their now-truncated form, and I will admit what remains of them on that basis.

### CATEGORY V.

Category V is concerned with several oral statements made by Cessna employees to others within or without the company organization. Since they are offered as vicarious admissions under Rule 801(d)(2)(D), the points made under Category I with respect to that Rule apply equally here. The present inquiry, however, is limited to whether the statements were ones "concerning a matter within the scope of [the statement maker's] agency or employment, made during the existence of the relationship."

 Of the objections in this Category which remain to be ruled (defendants having withdrawn their objections to Items 85, 85A, 86, 87 and 91), those relating to Rausch's statements to Crawford will be overruled. Contrary to defendants' suggestions, the record in fact reflects that Rausch remained employed by Cessna at the time of the statements (*see* Tr. pp. 3209–10); if not as the active Kansas City zone manager then at least with the re-

sponsibility of "breaking in" Mr. Crawford, his replacement, to that position. His statements were, at the same time, ones concerning matters within the scope of his employment in that respect. The fact that the statements were made shortly before termination of Rausch's relationship with Cessna, and may have resulted from ill-feeling toward Cessna, might well affect the weight the court gives them but does not affect their admissibility. Further, with respect to Item 89 I accept Mr. Rausch's comments not as a prediction for the future but rather as a general reflection upon what had happened in the past, although I certainly do not take the statements literally and in fact will probably find them of relatively little assistance since they do no more than convey the general idea that Walston had, to some undefined extent, engaged in the activities in question.

 The remaining item concerns a statement made by Mr. Allen to plaintiff White. Even though I can—given the question asked—accept Mr. White's testimony that "[t]hey all acknowledged the problem" (of independent distributor competition with White) as including statements by Mr. Allen, the record tells me only that Allen was a Cessna "single-engine salesman" dealing with "upper" single engine aircraft in the Kansas City area. I do not know whether matters concerning "lower" single-engine aircraft, multi-engine aircraft, or aircraft parts were within the scope of his employment, and lacking any foundation in that respect I must sustain the objection insofar as those subjects are concerned. To the extent the statements relate to "upper" single engine aircraft, however, I will accept them, although the generality of the situation leaves the evidence with no specific usefulness.

### VI

### CATEGORIES VI. AND VII.

For convenience sake Categories VI and VII will be considered together. In general, the items in each category consist of

individual aircraft files maintained by Walston Aviation, Inc., Aviation Activities, Inc., and Southaire, Inc., all contracted distributors of Cessna aircraft. Plaintiffs offer the documents for the purpose of showing the date upon which Cessna sold a particular aircraft to one of those distributors, the price for which it was sold, the date the distributor resold the aircraft, the price for which it was resold, and the fact that record title was transferred by the distributor to the purchaser indicated.

It is in connection with this last item of information that much of the present dispute arises. As a part of their case plaintiffs also set about to establish that in some instances the distributor-to-identified dealer sale reflected by a file, while correct in showing the chain of title transfer, was in reality a "direct" (or "conduit" or "pass through") sale by the distributor to a party other than the indicated dealer; *viz.*, a sale which was directly negotiated and consummated between the distributor and the ultimate purchaser, with the documents of title being prepared to show a transfer to the dealer and thence to the ultimate purchaser although the dealer never saw the airplane, had no participation in the sale and received only a small fee to process the paperwork. Defendants suggest that plaintiffs have, by this very process, succeeded in undercutting the whole "trustworthiness" basis of the records for Rule 803(6) purposes, and that the records in their entirety are thus inadmissible.

■ I believe any objection on this ground must be overruled. An appropriate foundation was laid establishing the files—in general—as ordinary business records of the distributor in question. No one has suggested that any of the information pertaining to the sale of an aircraft from Cessna to the distributor was incorrect or falsified; nor is there any reason, even given the later transactions regarding that aircraft, to be suspicious of those initial entries. And in fact there is no suggestion, even with regard to the later transactions, that title was not transferred by the distributor to the dealer in question, although it may have been simply a "paper" transaction. The fact that plaintiffs seek to go behind the record with respect to that ultimate transaction, to establish something other than that which might ordinarily be inferred from the document, does not in the circumstances present here warrant an exclusion of the entire document, *compare United States v. Ellenbogen*, 365 F.2d 982, 987–88 (2d Cir.1966), or for that matter, given plaintiffs' stated purposes for the document, warrant exclusion of any part of it.

■ Some of the evidence offered to show the fact of a "direct" or "pass-through" sale, however, is properly subject to objection. As concerns certain of the Southaire files, the testimony of Mr. Tumbleson was that, as a part of Southaire's established office routine, a secretary was directed to keep separate those aircraft files which related to "direct" or "pass-through" sales, while the transaction was being negotiated. When the transaction was completed those files were returned in an unsegregated manner to the company's general files. Some years later, during this litigation, Mr. Tumbleson requested that the secretary resegregate those files and deliver them to him. Mr. Tumbleson then produced *that* group of files to the court as reflecting "direct" or "pass through" sales. The documents in the files, however, do not reveal that fact, and in many instances Mr. Tumbleson was unable to establish the fact by way of his own firsthand knowledge with respect to the sale. Neither was he able to identify the files, of his own knowledge, as those which had been originally segregated; nor was the secretary called as a witness. Defendants object on the basis that the secretary's action in reassembling the files and delivering them to Mr. Tumbleson was assertive conduct which amounts to hearsay.

Rule 801(c) defines hearsay as:

"A statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

Rule 801(a) in turn defines "statement" as:

"... (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by him as an assertion."

It is thus clear that out-of-court conduct which is *intended* as an assertion of information is hearsay, inadmissible unless within some exception to Rule 802.[13]

■ In the present instance, the secretary's actions rather clearly amount to assertive conduct and are thus hearsay. First, those actions were in direct and specific response to a request from Mr. Tumbleson that she reassemble the earlier-segregated files. Her actions thus not only inferentially reflect her belief that the files she gathered were those requested; they represent her intended assertion to Mr. Tumbleson that they were. The situation in this regard is no different than if Mr. Tumbleson had asked her to point to the files, with an accompanying response on her part. *Compare United States v. Caro*, 569 F.2d 411, 416 n. 9 (5th Cir.1978); *Stevenson v. Commonwealth*, 218 Va. 462, 237 S.E.2d 779, 781–82 (1977) (citing Rule 801(a) and (c)). Second, both her original segregation of the files and her later reassembly of them not only inferentially reflect her belief that the transactions involved were "pass-through" sales; her actions are a direct assertion of that fact, given her instructions. Since there is no hearsay exception available for those "statements," they must be held inadmissible.

The result is that admissible proof of a "pass-through" sale will exist as to the Southaire files only in those instances where Mr. Tumbleson (being the sole witness offered on the subject) has been able to testify to the fact based upon his first hand knowledge. For the parties' convenience, my review of the transcript indicates those files to be #s 1085, 1098, 777, 1049, 1050, 791, 1084, 1110, 780, 781, 782, 783, 784, 785, 786, 787, 809, 810, 811, 812, 813, 870 and 945. The remaining Southaire files will not be accepted as reflecting a "pass-through;" instead I will accept them simply as demonstrating a sale to the Southaire dealer shown in the relevant file documents.

A different variation of the problem exists with respect to the Aviation Activities files (Item 95). Here plaintiffs offered the testimony of Angelo Morasco, zone manager of Aviation Activities during the time the files were accumulated. Morasco was familiar with the way in which the files were kept, with the sorts of documents contained therein, and with how those sorts of documents were handled. From him plaintiffs elicited testimony that he was able, by way of that knowledge, to determine from the presence or absence of certain documents that each of the files involved in Item 95 was one in which a "pass-through" sale had occurred, even though he had no first hand knowledge of most of the transactions themselves. Plaintiffs apparently offer that testimony under either Rule 701 or 702.

■ As I did at trial, I will admit the testimony. To the knowledgeable eye, files of this nature may indeed reveal something not readily apparent to an ordinary person. Whether approached under Rule 701 or Rule 702, the witness was shown to be qualified to engage in that sort of interpretation and explanation. The requirements of either rule are thus satisfied. The weight I give such testimony, or whether I credit it at all in the final analysis, is of course another matter.

■ Defendants also object to all of the aircraft files in Categories VI and VII on the basis that the sales price data therein is misleading since in many instances a trade-in was involved, with consequent adjustment of figures to suit the buyer's convenience or tax needs. I acknowledge the underlying point as well taken. That point, however, affects only the ultimate use plaintiffs may be able to make of the files,

---

**13.** There is, of course, a problem in distinguishing between that sort of conduct and so-called "implied assertions"—that is, conduct which is not specifically intended by the actor as an assertion of the fact in question but which may nevertheless be relevant as inferentially reflecting the actor's belief in that fact. *See generally* 5 *Weinstein's Evidence, supra* at 801–53 to 801–60. The distinction must be made, however, because while the former is hearsay within the definition of Rule 801(a)(2), the latter is not. *Id.*

not their admissibility. The objection will be overruled.

Finally, defendants note that many of the files contain documents which are not business records of the entity in question within the meaning of Rule 803(6), or otherwise admissible. For example, file # 1092 (maintained by Aviation Activities) contains a copy of a complaint filed against both Cessna and Aviation Activities in an unrelated lawsuit. The point is well taken; the difficulty is that there are many files, each containing many documents, and that to require plaintiffs to designate, during trial, each individual document they wished to use would have been quite time consuming and awkward, and might have been relatively needless as well in a bench tried case such as this, since plaintiffs' basic approach is reasonably clear. To accommodate the problem I indicated during trial that if a file—in the general sense—had been properly authenticated and demonstrated to be a business record of the custodial entity, it would be admitted as such with a rebuttable presumption that all documents therein were business records of that entity unless upon their face they indicated otherwise. In retrospect, I believe that ruling was overly-generous, and I will now refine matters to this extent: (a) bills of sale or contracts involving the custodial entity as a party, (b) orders for aircraft by the custodial entity, (c) financing documents involving the custodial entity as a party, (d) zone transfer notifications by the custodial entity, (e) invoices or receipts authored by the custodial entity, (f) credit memos authored by the custodial entity, and (g) correspondence from or internal memoranda of the custodial entity, to the extent they demonstrate or the court can reasonably infer that the information therein was a matter of first hand knowledge to someone employed by the custodial entity, will all be admitted under Rule 803(6) or simply as reflecting operative facts; (h) purchase orders and like documents directed to the custodial entity will be admitted under Rule 803(3) or simply as reflecting operative facts; and (i) communications *from* Cessna or CFC will be admitted as operative facts, or under Rule 801(d)(2)(A), (B) or (C) to the extent they meet the requirements of that rule, as appropriate. Other documents within a file will be treated as *not* admitted unless a party specifically identifies that document and requests its admission in connection with the merits briefing in this case. If such a request is made the court will rule on the admissibility of the document at the time of its ruling on the merits. Further, where the source of a document is not reasonably apparent from the face of the document or the foundational testimony it will be excluded. Finally, to the extent any party wishes to rely specifically upon an aircraft file item within category (g), or upon an item within category (i) which is in the form of a letter or telex, the party will be required to identify that document on a separate schedule annexed to its brief, so that the court and opposing counsel will be in a position to determine whether it meets the criteria for admissibility set forth above and elsewhere in this opinion.

To summarize: defendants' objections to the admission of the aircraft files listed under Items 92–99, inclusive, will be overruled, on the basis outlined in the preceding paragraph; defendants' objections to Mr. Morasco's "opinion" testimony regarding aircraft files which reflect "pass-through" sales (listed under Item 95) will be overruled; and defendants' objection to Mr. Tumbleson's efforts to establish certain files in Items 93 and 94 as reflecting "pass-through" sales, based upon a secretary's segregation of those files, will be sustained.

## VII.

## CATEGORY IX.

The evidence in question here is plaintiff White's proffered testimony concerning the results—in verbal summary form—of his personal examination of certain documents maintained in the Title Registry of the Federal Aviation Administration (FAA) offices in Oklahoma City, Oklahoma. Those documents were title records maintained by

the FAA as a part of its official functions, showing the title transfers in the history of various specific aircraft. Neither the records themselves nor copies thereof were present in court; nor did plaintiffs make any effort to demonstrate that copies were unobtainable. Defendants object on best evidence and hearsay grounds.

■ Defendants' best evidence objection must be sustained. The testimony in question represents an unabashed attempt to prove the contents of documents without producing either the originals or appropriate copies thereof. Since the documents clearly fall within the scope of Rule 1001(1), and since they cannot be considered "collateral" within the meaning of Rule 1004(4) (given the nature of the information plaintiffs seek to use from them), Rule 1002 necessarily prohibits White's testimony unless some other exception to Rule 1004 is applicable or (assuming for the moment these are "public records" within the meaning of Rule 1005) an appropriate showing is made that copies cannot be "obtained by the exercise of reasonable diligence." Plaintiffs made no showing on either point. Nor are plaintiffs aided by seeking to categorize White's testimony as a "summary" under Rule 1006. Even if the rule could be applied to a verbal summary (which is doubtful), it would require that the originals or duplicates of the documents have been made available for examination or copying by the defendants, if not produced in court. Plaintiffs expended no effort at all in that regard. The mere fact that the records were available for defendants' perusal, in Oklahoma City, is no answer when the matter is first raised during trial.

## VIII.

### CATEGORY X.

During the course of trial, through the testimony of plaintiff Eugene Ingram, plaintiffs sought to introduce Plaintiffs' Exhibit #1456, a purported summary of information relating to aircraft purchased and sold by Ingram's Carthage, Missouri

Cessna dealership (Carthage Airways, Inc.), both in its status as a Cessna "zone" dealer and as a dealer for independent distributors DAD and Skyliners, Inc. This document was not identified prior to trial, although the records from which it was prepared—primarily the relevant federal income tax returns of Carthage Airways, Inc. —were produced at trial and were made available to defendants. These tax returns, however, were not the original source documents, those having been destroyed by Ingram (after he sold the dealership) in approximately 1982. Further compounding the problem is the parties' dispute over whether those original source documents were ever the subject of a discovery request of any kind from the defendants.

■ Taking these problems in reverse order, a review of the file indicates, contrary to plaintiffs' suggestion, that production of the Ingram records was in fact sought under defendants' document production request of August 10, 1976. The fact that the court sustained (in part) plaintiffs' objections to certain separate written *interrogatories* filed at the same time, on the basis that defendants were entitled to obtain only an identification of the transactions in question by way of a Rule 33 *interrogatory answer*, and would be required to gather the underlying information with respect to those transactions by means of other discovery devices, hardly represents a ruling that a Rule 34 document production request relating to that underlying information was improper; indeed, just the opposite would appear to be the case. It likewise appears that Ingram never responded to that request. On the other hand, I can find nothing in the records of this case to indicate that defendants ever filed any motion to compel Ingram to respond. Since Rule 37(b)(2) placed that burden on the defendants, if they wished to make something of the point, I can only conclude that they have waived their present objection, even if by inadvertence.

Defendants also point out—correctly—that Mr. Ingram's 1982 destruction of the documents in question was in violation of the court's document retention order of September 12, 1972. If there was any indication whatsoever that this was an intentional violation on Mr. Ingram's part, I would sustain defendants' objection without pause and in fact would proceed to other sanctions. The inference from Mr. Ingram's testimony, however, is that he was unaware his actions were in violation of that order. This does not, of course, excuse his counsel's apparent failure to advise him of the order or by any means entirely eliminate the problem, but it does cause me to approach the matter somewhat more flexibly, with a view to determining just how important those ultimate underlying documents may be, given the existence of more or less contemporaneous income tax records which do still exist. That leads me, in turn, to the parties' arguments over plaintiffs' failure to list the exhibit prior to trial, since many of the same basic considerations are involved with respect to that question.

■■■ Plaintiffs' failure to identify the exhibit prior to trial is unexplained and inexcusable. On balance, however, and despite some lingering misgivings, I will overrule the objection on that basis. The only information shown on the exhibit, not already in evidence, concerns the dates when Carthage Airways sold an aircraft and the price received therefor. The transactions in question are only 22 in number, and of these the pertinent information exists for only 16. The sales are not claimed "direct" or "pass-through" sales by a distributor, necessitating the detailed cross-examination defendants have pursued elsewhere in respect of such alleged sales. Finally, although it by no means excuses plaintiffs' failure to list the exhibit prior to trial, defendants were at least presented with the exhibit, and the underlying tax documents, six days before plaintiffs' actual use of them and appear to have been able to respond in appropriate fashion.

■■ As the discussion under Category IV may suggest, it is unnecessary to turn to Rule 1006 as a basis for admitting Exhibit # 1456. Given the circumstances surrounding the destruction of the original underlying sales records the requirements of Rule 1004(1) are satisfied, thus permitting the use of "secondary" evidence with respect to the contents of those original sales records. In theory, of course, the contemporaneous tax records prepared from the sales records might represent "better" secondary evidence than the present summary thereof; but it is clear that Rule 1004 does not recognize "degrees" of secondary evidence. *Neville Construction Co. v. Cook Paint and Varnish Co.*, 671 F.2d 1107, 1109 (8th Cir. 1982); *United States v. Standing Solder*, 538 F.2d 196, 203 n. 8 (8th Cir.1976), *cert. den.*, 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976); 5 *Weinstein's Evidence, supra* at 1004–4 to 1004–6. Inasmuch as the tax records were made available to defendants (even though not a requirement under Rule 1004), and in fact were used by them in cross-examining Mr. Ingram, I can see no essential unfairness in accepting the exhibit.

Plaintiff's Exhibit # 1456 will accordingly be admitted, under Rule 1004(1), for the purpose of summarizing the dates of sale and sales price of aircraft sold by Carthage Airways, as well as the amounts of depreciation claimed with respect to each plane (an item defendants have asked to include if the exhibit is admitted at all). It will also be received as a "pedagogical" device with respect to information admitted elsewhere concerning the acquisition date, price and seller of aircraft purchased by Carthage Airways.

## IX.

## CATEGORY XI.

The final category designated by the court involves a miscellaneous group of hearsay objections, together with a best evidence objection to certain testimony of Eugene Ingram. I will not burden the record with an explanation of my rulings

on those matters, except in those instances where the basis for that ruling might otherwise be unclear.

 Item # 111 involves testimony that a prospective aircraft purchaser stated to the witness that he (the prospective purchaser) was "looking favorably" on buying an aircraft from another manufacturer. I take that statement to be one of the prospective purchaser's then existing state of mind, and find it admissible under Rule 803(3).

As to Item # 112, rather than deal with defendants' "opinion" objection as such, I will reverse my trial ruling upon relevancy and strike Exhibit # 121 in its entirety. Although I sustained almost no relevancy objections during trial, and certainly do not propose, in a bench-tried case such as this, to reexamine all those rulings at this point, upon reflection I am unable to see any probative value at all in Exhibit # 121. In light of that fact I see no reason to indulge in the somewhat futile exercise of ruling a separate objection to an isolated part of the exhibit.

 Item # 118 involves plaintiff White's testimony that he observed, in an aircraft being serviced at his place of business sometime in 1969, a packet of documents bearing the name of a particular distributor and an identification number corresponding to the number of the aircraft being serviced. Defendants' best evidence objection will be overruled under Rule 1004(1), (2) or (4) since common sense suggests, even in the absence of any testimony on the subject, that it would be extremely difficult and expensive if not impossible to trace and identify that packet of documents at this time.

Finally, defendants' objections to the designated portions of Mr. Ingram's testimony will be overruled. The first of those matters has already been addressed, in principle, under Category X. As to the remaining, items, defendants' relevancy objection is tied to a resolution of some of the substantive legal issues at stake. Since I prefer to deal with those issues after the par-

ties' merits briefing, I will admit the testimony, noting of course that the ruling is not intended as a reflection of my views on those substantive issues.

IT IS SO ORDERED.