262 F.Supp.2d 251 (2003)
PENGUIN BOOKS U.S.A., INC., Foundation for "A Course in Miracles, Inc.", and Foundation for Inner Peace, Inc., Plaintiffs,
v.
NEW CHRISTIAN CHURCH OF FULL ENDEAVOR, LTD., and Endeavor Academy, Defendants.
No. 96 Civ. 4126(RWS).
United States District Court, S.D. New York.
May 7, 2003.
*253 Epstein, Becker & Green, New York, NY, By: Frances M. Maloney, John J. Rosenberg, for Plaintiff Foundation for Inner Peace and Foundation for "A Course in Miracles," Inc., of counsel.
Lawrence E. Fabian, New York, NY, for Defendants.

OPINION
SWEET, District Judge.
Defendants New Christian Church of Full Endeavor, Ltd. (the "Church") and Endeavor Academy (the "Academy") (collectively, the "Defendants"), have moved in limine to admit certain evidence at the trial of this action presently scheduled for May 19, 2003. The motion is granted with respect to the California materials as described below and denied as to the North Carolina materials, also described below, unless further authenticated.

Prior Proceedings
Penguin Books USA, Inc. ("Penguin"), Foundation for Inner Peace, Inc. ("FIP") and Foundation for "A Course in Miracles, Inc." ("FACIM") filed their third amended complaint on September 21, 1999, seeking junctive relief to prohibit the infringement *254 of their copyright in "A Course in Miracles" ("ACIM") by the Defendants.
Cross-motions for summary judgment were determined in an opinion and order of July 25, 2000 (the "July 25 Opinion") which dismissed the Defendants' affirmative defenses other than prior publication which remains as the subject of the scheduled trial.
The instant motion was heard on April 30, 2003.

The Materials At Issue
On the issue of prior publication, the Defendants seek to admit:
(1) A book, Journey Without Distance ("JWD") authored by Robert Skutch (a founder, officer and director of FIP) ("Skutch") and published by FIP and in particular, the statement in JWD to the effect that over a hundred people were permitted to make copies of "A Course in Miracles" (referring herein as "ACIM" or "The Course") without a copyright notice in 1975;
(2) a videotape of Joe Janis ("Janis") sent in 1991 by FIP with a covering letter signed by Skutch and Judith Skutch Whitson ("Skutch Whitson"), as vice-president and president of FIP, relating in part to his acquisition of ACIM;
(3) a videotape of Janis recorded in 1991 by David Kravetz ("Kravetz"), a resident of North Carolina, and the testimony of certain North Carolina residents as to a statement made to them by Janis;
(4) audio tape recordings of FIP officers that are over twenty years old, found in the archives of the Association for Research and Enlightenment ("ARE"), a non-profit organization founded in 1931 for dissemination of the psychic readings of Edgar Cayce and the study of other information regarding psychic phenomena.

The Facts
The facts are gleaned from the parties' submissions on this and prior motions and do not constitute findings by the Court.
FIP was founded on October 21, 1971 by Skutch and Skutch Whitson.[1] Skutch and Skutch Whitson have been directors since its inception, and were married at the time of its inception. FACIM was organized in 1983 and is headed by Ken Wapnick ("Wapnick"). FIP essentially transferred control of ACIM to FACIM in 1998. The Board of FIP and FACIM are controlled by the same three people, Skutch, Skutch Whitson and Wapnick.
Skutch Whitson and/or FIP received an alleged oral assignment of the right of Helen Schucman ("Schucman") to the copyright to A Course in Miracles sometime in 1975. The creation of ACIM by Schucman was described in the July 25 Opinion and consisted in large measure of her account of messages she received from a voice she identified as Jesus. Skutch filed the copyright for ACIM for FIP on November 24, 1975, swearing to a date of first publication as October 6, 1975 in the form of the Freeperson Press edition.
As president of FIP, Skutch Whitson has stated the purpose of FIP to be "a holding, non-profit foundation that publishes A Course in Miracles and disseminates it." FACIM has essentially the same purposes and is the assignee of all of FIP's rights.
The Defendants have obtained copies of ACIM and seek to use and propagate it in their own studies and endeavors.
*255 Skutch and Skutch Whitson determined that an account of how ACIM came to be should be written in order that the official story be told before someone "who was not close to it" wrote it. Skutch wrote JWD in 1980 over a year-long period in which he gathered information via his own personal knowledge, and in interviews and conversations with his then-wife Skutch Whitson, Bill Thetford, Wapnick and Jerry Jampolsky. Those interviewed or used as sources read a portion of the draft of JWD that related to them and did not object to their contents. Skutch Whitson and Wapnick now assert they requested Skutch not to write the book.
JWD was first published by Celestial Arts Press in 1984 (referred to as the "Celestial Edition"). Sometime in 1996, FIP published the book itself (referred to as the "FIP Edition") with no changes to the text. After this litigation between the parties commenced, FIP published JWD again in 1996, with changes to the text (referred to as the "Modified Edition").
FIP has received all monies generated by the publication and distribution of JWD. There has been appended to The Course since at least 1984, a list of other ACIM related books endorsed by FIP, including a description of JWD in which FIP and FACIM state:
JOURNEY WITHOUT DISTANCE. The complete inspirational story of how A Course in Miracles came to be, taking the reader on a fascinating journey that spans more than seventy years. Meet Dr. Helen Schucman, the highly respected research psychologist who heard a "Voice" dictating the material to her. Learn how Dr. William Thetford, the head of her Psychology Department, aided and supported her. Written by Robert Skutch, co-founder of the Foundation of Inner Peace, publishers of the Course. 142 pages. Hardcover $13.95; softcover $8.95.
The back of JWD on all editions states:
Written by Robert Skutch, co-founder and director of the Foundation for Inner Peace, publishers of the Course, it takes the reader on a fascinating journey that spans more than seventy years ... questions integral to the telling of the story are vividly answered in this suspense filled and dramatic account told by Mr. Skutch who knew all those involved personally, and who was told the details by the principals themselves. This is a book that will be eagerly read not only by those who are familiar with the Course, but by all who are fascinated by an extraordinary true story.

In the Celestial and FIP Editions of JWD, the book states there was a distribution of copies of the ACIM manuscript to at least 100 people in the San Francisco Bay area prior to any publication with copyright notice. The date for this distribution is contended by the Defendants to be June of 1975, during a trip by Skutch Whitson which occurred approximately ten days after she received the Course on May 29, 1975.
The Celestial Arts and FIP Editions read as follows:
Ten days after she received the Course from Helen and Bill, Judy was scheduled to go to California in order to attend some meetings related to the work of her foundation, and to have meetings with her doctoral advisor, Dr. Eleanor Criswell. She asked Helen and Bill if it would be all right to take the material with her and show it to a number of friends whom she knew would be interested.
"California's three thousand miles away," Bill said lightly. "Nobody knows us out there."

*256 The seven black thesis binders containing the fifteen hundred pages of the Course weighed almost twenty pounds, and though Judy had not taken them out of her apartment since she received them, she had a good idea as to how heavy and cumbersome they were to carry around. When she got ready to go to the airport, the only way she could think of to carry them was in a shopping bag, but even before she picked them up she knew something had to be done to make them more portable.
On the plane she had six hours of quiet time to think about the Course and to recognize how many of her friends were going to want copies once she" told them about it. She didn't have any idea how she would be able to accommodate their requests, but she remembered the very first principle of miracles in the Text. "There is no order of difficulty in miracles," and she decided that if her friends were meant to have them, somehow they would get them.
One of the first people she showed the Course to was James Bolen, the editor and publisher of Psychic Magazine ... The problem then arose concerning how he could work with the Course if Judy had only one copy with her, and Jim decided the only thing to do was to make a Xerox copy. Because of his publishing connections, he was able to have the job done in twenty-four hours, and for "only forty-eight dollars."
Obviously, this was not going to be a very practical solution. Not only was the material in this form much too cumbersome, but Judy couldn't keep lending her copy out for twenty-four hours to everyone who wanted it. Despite this, expedients did develop. Jim's copy started to be reproduced. And those copies were then copied. And before long there were over a hundred people in the San Francisco area in possession of A Course in Miracles ...
Judy let some friends know that Helen and Bill were coming to the Bay Area for a short stay, and that they were willing to talk about the Course to a few people. Within a week it was obvious that many were interested in coming to such a meeting, and by the time a date was set, over a hundred individuals had indicated that they would attend ... From the very beginning of that first meeting, it was clear that the people who had Xerox copies of the Course were extremely serious about working with and discussing the material.
Ex. 7 and 8, pp. 109-111.
In the Modified Edition of JWD, the reference to the people with "Xerox copies" was changed to people "who had been told about the Course." The statement that Skutch Whitson "couldn't keep lending her copy out to everyone who wanted it. Despite this expedients did develop. Jim's copy started to be reproduced. And those copies were then copied. And before long there were over a hundred people in the San Francisco area in possession of A Course in Miracles" has been omitted in the Modified Edition.
In early October 1975, Janis came to New York to see Skutch for spiritual healing. On the day Janis came to Skutch and Skutch Whitson's apartment for spiritual hearing, Skutch Whitson claims to have given Janis part or all of the un-copyrighted manuscript of ACIM without copyright notice affixed and also a copy of the Criswell Edition.
At the fifteen year anniversary of Janis's ACIM study group, held in Durham, North Carolina on January 15, 1991, Janis gave a speech videotaped by Kravetz and discussed how he received ACIM from Skutch Whitson and had proceeded to make copies of ACIM and distribute it to a study group in North Carolina where he lived. A number of people in North Carolina *257 apparently received copies from Janis and helped in the photocopying and distribution of the original 8 1/2 × 11 pages of the un-copyrighted manuscript.
In the mid-1980's, Bridget Winter ("Winter"), a producer/director who was at that time employed by the BBC, began to prepare a documentary about the creation of the book A Course in Miracles. Winter chose to create the documentary as a result of her own interest in the topic. During the course of her project, Winter shot some 30-plus hours of videotaped interviews of various individuals, including footage of Janis. Skutch Whitson participated in the latter stage of editing. Winter edited her footage to create a documentary video that was approximately two-and-aquarter hours long and did not include the Janis interview.
The BBC advised Winter that it would not "air" the documentary without substantial changes. Unwilling to accede to the BBC's requested alterations, Winter abandoned the project, and instead provided her videotape to FIP in exchange for a portion of any royalties FIP might receive from sales of the edited video. In or about 1987, FIP made available for distribution the edited version of the documentary, entitled The Story of A Course In Miracles.
Janis died in 1991, and in that same year, FIP was contacted by a member of a North Carolina study group for A Course in Miracles founded and led by Janis, who advised FIP that the study group was preparing a memorial for Janis, and requested that FIP provide the group with a copy of the outtakes of Winter's video of Janis's interview. Although Winter had provided Skutch Whitson with a copy of all of the outtake footage from her interviews, Skutch Whitson did not know if FIP possessed the outtakes containing the Janis interview.
After searching through her garage in response to the North Carolina group's request, Skutch Whitson located the outtakes that Winter had given to her and she found that one of them bore a label with Janis's name on it and then provided a copy of this tape to the study group in response to their request for use in connection with their planned memorial tribute. The outtakes of the Janis interview were transmitted to the North Carolina study group under cover of a letter written on FIP letterhead that was signed by Skutch Whitson and Skutch. These outtakes were not provided to any other group or individual, and were never published or otherwise disseminated by FIP. In a cover letter forwarding the outtake footage, Skutch Whitson and Skutch observed that "we hope you will be as moved as we were with the results and that you will understand just how much we share with you our mutual admiration and love for our dearest brother, Joe."
The initial portion of the quoted segment of the video outtakes indicates that Janis was first introduced to A Course in Miracles after the initial copyrighted version had been printed.
In the videotape, Janis stated in part:
I was trained as a parapsychologist, as a scientist, and was extremely skeptical when Judy gave me this Course. The Course was not in its published form. When she gave me the Course it was in a series of black binders. And when she first showed me these black binders I opened them and I saw the words "This is a required course," and almost closed them at that point because I was through with, I thought, required courses. So my reaction then was one of skepticism, but I agreed to take the Course back with me to North Carolina. The Course had not been formally published but was available in mimeographed sheets and a paperback version which Judy gave to me. I took the work *258 back with me and began to read the Course and to study it. And so I felt that I needed to share this, and so I got permission from Judy to Xerox.
Janis then states that Skutch Whitson was unaware of his alleged copying activities, stating that "[Skutch Whitson] didn't realize that I printed off a hundred copies, I never told her that."
A separate videotape of Janis was made in 1991 by Kravetz at a fifteenth anniversary celebration of the study group. In the videotape, Janis describes receiving the manuscript and Skutch Whitson's statement that "if anyone down there ... wants a copy of the Course, then I will have to charge them $50." Janis then recalled:
So I called Judy, asked her if it was O.K. to Xerox it, and I xeroxed it and handed out about actually 100 copies.
The audio tape recordings of certain of the FIP officers found in the ARE archives were the subject of testimony from a senior manager of ARE, Kevin Todeschi ("Todeschi"), that the tapes were in the ARE audio visual archives and library, that, as a matter of course, ARE used to audiotape every seminar it held, and that ARE used to have an audio visual department dedicated to this function. When Todeschi found the tapes, they were in the archives and the library, places where other tapes by other seminar speakers were kept.
Todeschi, who had worked at ARE for approximately twenty years has testified that the tapes were found in boxes in the audiotape room marked with Skutch Whitson and Wapnick's names, and that it was the norm for ARE to have a tape box with a speakers name on it if they spoke at ARE multiple times, that a few of the 23 tapes were found in the general library of ARE, which were sold in the ARE bookstore or had been donated to ARE by a member of a lecture at another location, and that one tape found in the ARE library was marked "Wagner College."

The JWD Is Admissible
The rule on party admissions contains five separate bases for imputing a statement to a party. The first is the party's own statement, Fed.R.Evid. 801(d)(2)(A); the second is a statement which a party has manifested an adoption or belief in its truth, Fed.R.Evid. 801(d)(2)(B); the third is a statement by a person authorized by a party to make a statement concerning the subject, Fed.R.Evid. 801(d)(2)(C); the fourth is a statement by the party's agent or employee concerning a matter within the scope of his/her agency or employment, Fed.R.Evid. 801(d)(2)(D); and the fifth are statements by co-conspirators, Fed.R.Evid. 801(d)(2)(E). When a statement is offered as an adoptive admission, the proponent must show that the party against whom the statement is offered adopted or acquiesced to the statement and that "adoption or acquiescence may be manifested in any appropriate manner." Fed.R.Evid. 801(d)(2)(B), advisory comm. notes. The rules call for "generous treatment of the avenue of admissibility" for admissions in general. Fed.R.Evid. 801(d)(2), advisory comm. notes.
Adoption is evaluated by examining the behavior of the party it is to be offered against. Adoption of another's statement can be manifest by any appropriate means, such as language, conduct or silence. A party may adopt a written statement by using it or taking action in response to or in compliance with it. 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 801.31 at 801.54-57 ["Weinstein"]; Schering Corp. v. Pfizer, Inc., 189 F.3d 218, 239 (2d Cir.1999).
"Adoption by use" is another way the courts describe behavior that constitutes evidence of adoptive admission by a party. White Indus., Inc. v. Cessna Aircraft Co., *259 611 F.Supp. 1049, 1062 (W.D.Mo.1985). The court stated, "use of a document supplied by another in fact represents the party's intended assertion of the truth therein, [and] an adoptive admission can be found," such as where a party forwards a document to another in response to some request for information contained in the document. Id. Furthermore, even if the document is not expressly "vouched for" by the party it must only be shown by implication that business was conducted in a fashion that the statement was adopted. Pekelis v. Transcon. & W. Air, Inc., 187 F.2d 122, 128 (2d Cir.1951), cert, denied, 341 U.S. 951, 71 S.Ct. 1020, 95 L.Ed. 1374 (1951).
An entity's printing, publishing and dissemination of a document or a report that contains statements that pertain in some way to the organization or company can constitute an adoptive admission. Alvord-Polk, Inc. v. F. Schumacher & Co., 37 F.3d 996 (3d Cir.1994), cert, denied, 514 U.S. 1063, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995) (statements made by trade association's officers, including the president, published in the association's newsletters were adoptive admissions of the association, even though there was a general disclaimed printed at the beginning of the newsletter.); Wagstaff v. Protective Apparel Corp. of Am., Inc., 760 F.2d 1074, 1078 (10th Cir.1985) (finding newspaper articles that included inflated statements of the defendant company's worth, that had been reprinted and distributed by the defendant company to people doing business with the company, to be "unequivocally" adoptive admissions.); Church of Scientology of California v. Commissioner of Internal Revenue, 83 T.C. 381, 514-15, 1984 WL 15614 (1984), aff'd, 823 F.2d 1310 (9th Cir.1987), cert, denied, 486 U.S. 1015, 108 S.Ct. 1752, 100 L.Ed.2d 214 (1988) (Policy letters, written by church founder and collected for publication by the church and as sold through the church bookstore, were adoptive admissions of the church).
Additionally, manifestation of belief in the truth of a statement may occur by silence, that is a failure to respond when natural to do so. 30B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure Evidence, § 7021 (Interm ed. 2002) ["Wright & Miller"]. In the case of written statements, such as letters or other documents, mere non-response is generally considered insufficient. However, if the declarant and the party are engaged in such a relationship that the recipient of a written statement would have been expected to take issue with the contents if he or she disagreed with them, adoption may be established. Weinstein, § 801.31 at 801-51; In re Columbia Sec. Litig., 155 F.R.D. 466, 478 (S.D.N.Y.1994) (holding that acquiring corporation's fraudulent statements in newspaper articles, that the it took no action to deny or correct, constituted adoptive admissions).
Ultimately any ambiguities and questions surrounding a party's actions and silences with regard to adoptive admissions should be for the jury to assess, U.S. v. Tocco, 135 F.3d 116, 129 (2d Cir. 1998), cert, denied, 523 U.S. 1096,118 S.Ct. 1581, 140 L.Ed.2d 795 (1998), following an initial evidentiary determination to be made by the judge.
The dissemination and later publication by FIP of JWD written by Skutch, the co-founder, vice-president and executive board member of FIP constitutes an adoptive admission by FIP. The involvement of other FIP officers and board members in the writing of JWD and the profit FIP made and continues to make from the distribution of the book also indicate that the book is an adoptive admission. The book is a nonfiction report produced by members of FIP for the benefit of FIP regarding the most basic of FIP's *260 stated purpose, the promulgation of ACIM. The book has been offered to the public by FIP in conjunction with this stated purpose since 1984.
JWD is an adoptive admission in the manner of the newspaper articles in the Wagstaff case, the newsletter articles and statements of an associations' offices therein in the Alvord case, and the writings of the founder of the Church of Scientology sold to the public by the Church of Scientology in the Church of Scientology case. These cases contemplated the dissemination or publication of printed material that related to the business or organizations policies and beliefs. JWD represents the same type of material for FIP as it is a book sold to the public that relates directly to FIP's stated purposes regarding ACIM and is the story of how ACIM came to be.
FIP's silence or lack of disclaimer as to the truth of JWD constitutes further evidence of its adoption of the book. The president of FIP, Skutch Whitson, never objected to the statements in JWD prior to this litigation. Skutch and FIP were allowed to disseminate and publish them until FIP reprinted the book in 1996 without changes except for the omissions of the 1975 San Francisco events. The 1975 actions appear to be a self-serving attempt to cover up its former admissions against interest in the Celestial and FIP Editions, without an acknowledgement that those admissions were made. They were hoping no one would catch the discrepancies. These actions are especially suspect, as they were made after this litigation began.
Under Fed.R.Evid. 801(d)(2)(C), statements by a person with "speaking authority" are authorized admissions, and under Fed.R.Evid. 801(d)(2)(D) the statement of an agent or employee concerning a matter within the scope of employment/agency made during that employment/agency is an admission of the employer/principal.
The relevant inquiry in Fed.R.Evid. 801(d)(2)(C) situations is whether the person making the statements had the authority to speak on a particular subject on behalf of the party the admission is to be used against. Wright & Miller, § 7022; Precision Piping and Instruments, Inc. v. E.I. du Pont de Nemours & Co., 951 F.2d 613, 619 (4th Cir.1991). The courts' inquiries generally require that a person making the statement be an agent of the partyopponent against whom the admission be offered. Wright & Miller, § 7022. In contrast, under Fed.R.Evid. 801(d)(2)(D) it is only required that the employee/agent has made the statements within the scope of employment. Precision Piping, 951 F.2d at 619-20. Therefore, in a Fed.R.Evid. 801(d)(2)(C) inquiry, the individual must have had specific permission to speak on a subject, such as a contract as opposed to in a Rule 801(d)(2)(D) inquiry where the individual only had to have general authority of the business area the contract falls under. Id.
Under Fed.R.Evid. 801(d)(2)(C), speaking authority can be either "expressly or implicitly" bestowed upon an individual. Weinstein, § 801.32 at 801-60. Under this rule, the court examines whether a person has speaking authority on the particular subject in question. A writing by an agent of a party that was written and researched with the party's permission and authority with free access to the party's books and information and then circulated by the party constitutes an admission under Fed. R.Evid. 801(d)(2)(C). Reid Bros. Logging Co. v. Ketchikan Pulp Co., 699 F.2d 1292, 1306-07 (9th Cir.1983), cert, denied, 464 U.S. 916, 104 S.Ct. 279, 78 L.Ed.2d 259 (1983).
As to Fed.R.Evid. 801(d)(2)(D) admissions, statements by company officers within the realm of that officer's responsibility and during the existence of the relationship *261 constitute an admission by the employer. Buscemi v. Pepsico, Inc., 736 F.Supp. 1267, 1270 (S.D.N.Y.1990) (Statements by the vice-president of personnel on a corporation's hiring and firing practices, printed in a magazine, were 801(d)(2)(D) admissions of the corporation); SEC v. Credit Bancorp, Ltd. No. 99 Civ. 11395, 2000 WL 968010, at *16 (S.D.N.Y. July 3, 2000) (letter by president of company on company letterhead constituted company admission). If an employee/agent was "an advisor or other significant participant in the decision making process that is the subject matter of the statement," the statements are considered within the scope of employment. Additionally, the speaker does not have to be the "final decisionmaker," but simply an advisor or significant participant in the decision-making process. U.S. v. Rioux, 97 F.3d 648, 661 (2d Cir.1996); Evans v. Port Authority of New York and New Jersey, 192 F.Supp.2d 247, 263-64 (S.D.N.Y.2002).
The courts have also stated on more than one occasion that reports or writings published by a governmental agency constitute admissions of the government under Fed.R.Evid. 801(d)(2)(D). E.g., U.S. v. Van Griffin, 874 F.2d 634, 638 (9th Cir. 1989) (A manual published by the government may be admitted as a party admission of the government under Fed.R.Evid. 802(d)(2)(D)).
Whether a statement concerns a matter within the scope of employment/agency under Fed.R.Evid. 801(d)(2)(C) or (d)(2)(D), is preliminary matter to be determined by the trial court. Hill v. F.R. Tripler & Co., Inc., 868 F.Supp. 593 (S.D.N.Y.1994). The trial judge's scrutiny of the evidence is a Fed. R.Evid. 104(b) inquiry and the standard that should be used is whether or not a juror could reasonably find that the admission was made within the scope of employment/agency or within the speaking authority. O'Neal v. Esty, 637 F.2d 846, 851 (2d Cir.1980), cert, denied, 451 U.S. 972, 101 S.Ct. 2050, 68 L.Ed.2d 351 (1981).
Skutch's statements in JWD constitute admissions under both Fed.R.Evid. 801(d)(2)(C) and (D). As a founder, officer and executive board member of FIP since its inception, Skutch clearly had a wide scope of authority over much of the decision-making process at FIP. He was authorized to file the copyright registration for ACIM.
As a Fed.R.Evid. 801(d)(2)(C) admission, this case is akin to Ketchikan. It was decided between Skutch and Skutch Whitson, the president and vice-president of FIP that the book should be written so the story of ACIM could be told by FIP itself, rather than by strangers unfamiliar with the facts of the true story. The executive board contributed to the research and writing of the book. There is absolutely no evidence that at any time prior to this litigation, did anyone from FIP's executive board ever object to the writing, formally or informally, to publication of the book. Skutch appears to have written the book for FIP, and in his role as an employee or agent of FIP, as he has never derived any income from the book, and only FIP has. After the book was written and published, it was distributed for the benefit of FIP, and FIP later republished and distributed it. FIP has always profited from the book. In these ways, JWD may be construed as having been created via FIP's "speaking authority" implicitly bestowed upon Skutch.
As a Fed.R.Evid. 801(d)(2)(D) admission, all of the above facts that apply to "speaking authority" have the same relevance for finding an admission by an employee/agent within the scope of their authority. But, under Fed.R.Evid. 801(d)(2)(D), the court must only find that the statements made *262 by Skutch in JWD were made within the scope of his employment/agency. As vicepresident, Skutch had authority over filing the copyright for ACIM and he also held executive decision-making power. He himself was a decision-maker in the reasons for writing JWD and having it distributed to the general public. As the only other officer of FIP other than Skutch Whitson and as an executive board member, he has arguably overseen all major decision-making at FIP. Therefore, the statements in JWD were all made within his scope of authority as the co-founder and vice-president and publisher of ACIM, and such comments in JWD that have to do with the publication of ACIM were clearly made within the scope of his authority. Additionally, it appears from the circumstances that Skutch wrote the book solely in his role as agent or employee of FIP as discussed above.

The Janis Videotape Is Not An Admission
In order for a statement of a third party to be deemed an "adoptive admission" under Fed.R.Evid. 801(d)(2)(B), the "surrounding circumstances, including circumstances and nature of the underlying statement itself, must be examined to determine whether an intent to adopt the statement is fairly reflected by the act or failure to act which is in question." White Indus., Inc. v. Cessna Aircraft Co., 611 F.Supp. 1049, 1062 (D.Mo.1985). Accordingly, "the mere fact that the party has acted (or failed to act, in the case of an admission by silence) in some way in reference to the statement or information (as by repeating it or retaining it) is not sufficient, standing alone, to justify a finding that there has been an adoption." Id. Rather, in order for a third party's statement to be deemed "adopted" by (and thus admissible against) a party to litigation, the latter's use of that statement, when analyzed in the context of all relevant facts and circumstances, must "represent [ ] the party's intended assertion of the truth of the information [contained] therein." Id
FIP provided the North Carolina study group with a single copy of some unused (and unpublished) video footage of an interview that had been conducted and filmed by an independent third party and there is no evidence that the outtakes were viewed or adopted by FIP.
Pursuant to Fed.R.Evid. 801(d)(2)(C), a statement by an individual with "authority" to speak on behalf of another party in respect of a particular subject may be deemed an authorized admission of that party. Similarly, under Fed.R.Evid. 801(d)(2)(D), a statement of an agent or employee of a party concerning a matter within the scope of that individual's employment/agency, made during the course of the employment/agency relationship, may be deemed to be an admission of the employer/principal.
Janis's statements cannot be considered an admission of FIP because Skutch Whitson and Skutch transmitted the outtakes. The individual who made the statements at issue (i.e. Janis) was not an employee or agent of FIP nor authorized to speak on FIP's behalf.
The Defendants have also suggested that the videotape statements can be used to impeach Skutch Whitson as "extrinsic evidence of a prior inconsistent statement" pursuant to Fed.R.Evid. 613. However, "[T]he [impeaching] statement must be that of the witness to be impeached and not of some other person." Wright & Miller, § 6203.
Once a witness has offered testimonial evidence at trial concerning a particular statement, evidence that the witness previously made a statement inconsistent therewith can be introduced through the testimony of another witness to whom *263 the trial witness allegedly made the earlier contradictory statement. E.g., Mc-Lean v. McGinnis, 29 F.Supp.2d 83, 94 (E.D.N.Y.1998), aff'd, 189 F.3d 461 (2d Cir.1999), cert, denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 490 (1999) (noting that impeachment testimony presented through a live witness at trial should have been admitted because, inter alia, "defense counsel laid a proper foundation for the introduction of [the impeaching witness's] testimony.")

The Kravetz Videotape and Janis Statements Are Inadmissible
The Defendants seek admission of the Kravetz videotape as "extrinsic evidence" of a prior inconsistent statement of Skutch Whitson. The "extrinsic evidence" that does not, in fact, contain a statement by the witness to be impeached, and foundational requirement that the witness offering the allegedly prior inconsistent statement (here, Janis) be available for and subject to cross-examination, is missing. See Wright & Miller, § 6203.

The Deposition Testimony Of The North Carolina Witnesses, Who Admittedly Have No Personal Knowledge Of The Relevant Events At issue, Is Inadmissible
Defendants next request that the double, and sometime triple, hearsay deposition testimony of various North Carolina witnesses who were acquainted with Janis be admitted into evidence. The Defendants seek admission of the testimony of a number of individuals in North Carolina who claim to have made copies of certain pages of an unidentified version of ACIM, allegedly with Janis's permission. Whether analyzed as substantive or impeachment evidence, the proffered testimony of the North Carolina witnesses is inadmissible. In the first instance, the testimony ultimately demonstrates nothing more than that these witnesses, at Janis's request, made copies of certain unidentified portions of an unidentified version of ACIM.
The testimony of two of these witnesses, i.e., Crawford Gilligan and Linda Fleishman, states that Janis told them that Skutch Whitson told him that he could copy portions of ACIM. A deposition witness' testimony that Janis recited to them what Skutch Whitson allegedly told him is plainly inadmissible as multiple level hearsay.
Nor does this testimony constitute as a prior inconsistent statement of Skutch Whitson. As discussed above, such extrinsic evidence must: (a) include a statement by the witness to be impeached, and (b) be introduced through the testimony of the impeaching witness (subject to cross-examination) who allegedly heard or was the recipient of the prior inconsistent statement, (here, Janis).
The North Carolina testimony is inadmissible.
Finally, the videotape does not establish the inconsistency of Skutch Whitson but only the copying by Janis. Indeed, the request for $50 a copy indicates that the copyright was being enforced. Only one copy was distributed with authority, even according to the videotape.

The ARE Audiotapes Are Inadmissible On This Record
Pursuant to Fed. R. Evid 901(a), the authentication of any evidence is a condition precedent to its admissibility. See Fed.R.Evid. 901(a). "[B]ecause tape recordings are likely to have a strong effect on the jury and are susceptible to alteration, the Second Circuit requires their authenticity to be established by clear and convincing evidence." United States v. Dinero Express, Inc., No. 99 Cr. 75, 2000 WL 1134484, at *1 (S.D.N.Y. Aug.9, 2000); United States v. Morrison, 153 F.3d 34, 56 (2d Cir.1998).
*264 In assessing whether a proffered sound recording is authentic, the Court is to consider a number of factors, including the following: (1) that the recording device used was capable of taping the conversation now offered in evidence; (2) that the operator of the device was competent to operate it; (3) that the recording is authentic and correct; (4) that changes, additions, or deletions have not been made to the recording; (5) that the recording has been preserved in the manner that is presented to court; (6) that the speakers are identified, and (7) that the conversation elicited was made voluntarily and in good faith. Dinero Express, 2000 WL 1134484, at *1 n. 3; see also United States v. Fuentes, 563 F.2d 527, 532 (2d Cir.1977).
The chain of custody of the tapes is less than perfect, but might be simply a question of fact that is left to the jury. However, the integrity of the transcript and the identity of the speakers has not been established.
Todeschi had no knowledge as to whether or not the tapes had been, or could have been edited or altered. He had no knowledge as to the identity of the speakers other than the labels.
Mazza could not testify as to the integrity of the tapes and in fact noted that the tapes had been started and stopped in a number of places, leading to the conclusion that the tapes were not integral and complete.
There has been no evidence to establish the identity of the speakers or indeed the relevance of any statements to the publication issue.
Finally, the ARE tapes are not admissible under Fed.R.Evid. 901(b)(8), which addresses authentication of "ancient documents" and "data compilations." The term "ancient document" generally encompasses written items such as wills, deeds, contracts, newspapers, publications, letters, office memoranda, ledger books, scientific reports, inscriptions, and the like. Wright & Miller, § 7113(b)(8). The tapes, therefore, are not "ancient documents" as that term is used in the relevant evidentiary rules, nor do they contain a "compilation" of any "data," rather they are simply alleged to be recordings of Skutch Whitson and other individuals speaking about ACIM. Because the recorded dialogues about ACIM on the ARE tapes do not constitute either "ancient documents" or "data compilations," Fed.R.Evid. 901(b)(8) does not provide a basis for their admission.
While the audiotapes are not admissible on the evidence to date, the Defendants are not precluded from submitting any additional evidence with respect to the integrity of a particular tape.

Conclusion
For the reasons set forth above, JWD is admissible, the Janis videotapes and statements are not, nor is the North Carolina evidence of copying. The ARE audiotapes cannot be authenticated on this record.
It is so ordered.
NOTES
[1] FIP was originally called the Foundation for Para-Sensory Investigations, Inc. ("FPI"). FPI changed its name to FIP on June 9, 1976.